# EXHIBIT 1

Case 2:25-cv-12937-TGB-KGA   ECF No. 17-2, PageID.134   Filed 03/04/26   Page 2 of 98

25-012153-CZ FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   8/7/2025 3:00 PM   Jacquetta Parkinson

State of Michigan

Third (Wayne County Judicial) Circuit Court

VERIFIED COMPLAINT

Thomas Andrew Schoenberger, Cicada 3301 Metaverse, L.L.C., a Utah domestic limited liability company, and Thomas Andrew Schoenberger doing business as Cicada 3301, Cicada 3301 Token, Cicada 3301 Portals, and Sophia Musik,

Plaintiffs,

v.

The Trustees of Michigan State University, a body corporate, Rebecca Bahar-Cook, Mike Balow, Dennis Denno, Renee Knake Jefferson, Sandy Pierce, Brianna T. Scott, Kelly Tebay, Rema Vassar, Kevin M. Guskiewicz, Heidi Hennink-Kaminski, Prabu David, Dimitar Deliyski, Shawn Turner, Monique Turner, and Laura Dilley in their official and individual capacities, Lisa Anne Derrick, and Paula Sue Voelkert Davis,

Defendants.

Case No. _____ - CZ

Hon. _____

_____/

CRANBROOK LAW GROUP, P.C.
Barry R. Powers (P40589)
10 S. Main St., Ste. 401
Mount Clemens, Michigan 48043-7910
(248) 515-8599
Plaintiffs' counsel

_____/

A civil action between certain of these parties arising out of the transaction or occurrence alleged in the complaint has been filed in the Michigan Court of Claims, where it was given Case No. 2025-00045-MM and was assigned to Judge James R. Redford. The action remains pending.

Plaintiffs, Thomas Andrew Schoenberger, Cicada 3301 Metaverse, L.L.C., a Utah domestic

limited liability company, and Thomas Andrew Schoenberger doing business as Cicada 3301,

Cicada 3301 Token, Cicada 3301 Portals, and Sophia Musik, for their complaint against

Defendants the Trustees of Michigan State University, a body corporate, Rebecca Bahar-Cook, Mike Balow, Dennis Denno, Renee Knake Jefferson, Sandy Pierce, Brianna T. Scott, Kelly Tebay, Rema Vassar, Kevin M. Guskiewicz, Heidi Hennink-Kaminski, Shawn Turner, Monique Turner, and Laura Dilley in their official and individual capacities, Lisa Anne Derrick, and Paula Sue Davis, say:

## Introduction

1. The State of Michigan, through the once venerable College of Communication Arts and Sciences of Michigan State University and other entities and persons, including but not limited to Defendants, and those acting in active concert with them with knowledge of their wrongdoing, unconstitutionally and unlawfully propagates polemic, under the guise of university scholarship when that very scholarship subordinates the public good to private advocacy.

2. Defendants, acting in active concert with others, proselytize and impose on the People their chosen religion.

3. In doing so, they inflict on the People, in the guise of university scholarship, ideological dogma. And they do so, unabashedly, all in the very name of the State.

4. That is, beyond question, inimical to the fundamental and natural, unalienable, freedoms, liberties, and rights of the People. Yet that is what the State is doing and has been doing through its arm, the MSU College of Communication Arts and Sciences.

5. No arm or agent of the State may do so without violating the constitutions and laws of the State of Michigan and of the United States.

6. Since the founding of our nation, the People have held it beyond question that no state may offend the supreme law of the land found in the United States constitution. The State of Michigan cannot usurp for itself such power.

2

7. To allow as much would be tantamount to allowing the State, acting alone and unbridled, unilaterally and autocratically to amend on its own the constitution, which power is reserved to the People and the People, alone.

8. The State is vested with awesome power, but it may not assert its power to the violence of the rights and liberties guaranteed to the People under the constitutions.

9. In the present case, the fundamental liberties at stake include: the freedom of worship, religious beliefs, speech, expression, thought and association, the right to equal protection of the laws, and the right to privacy.

10. Nor may the State find excuse or justification in the Bylaws, Ordinances, Policies, and other Governing Documents the Board of Trustees of Michigan State University has promulgated. To the extent the State seeks haven in its own enactments, it must fail. To justify its excess would necessitate its applying its Governing Documents in violation of constitutional guarantees.

11. When the State acts in such a manifestly unconstitutional way in the name of legislative and executive authority, intervention to check that excess is left to the equally robust power of the judiciary, which is the final and ultimate vanguard against such abuse.

12. The judiciary is the last bastion to safeguard the guaranteed, fundamental, vested rights of the People against these dangerous, authoritative excesses of the legislative and executive branches of the State.

13. Were the judiciary not to control such usurpations and grossly *ultra vires* movement, the rights and freedoms are lost by all People, not just Plaintiffs.

14. Unless the judiciary so intervenes in this action, the State, set so firmly and so nakedly unrestrained down such dangerous path, will find as its ultimate destination its own undoing.

3

15. It is for such critical, proper, and necessary intervention to redress such wrongdoing that Plaintiffs petition this Honorable Court.

The Parties Plaintiff

A.

16. Plaintiff, Thomas Andrew Schoenberger ("Thomas"), is domiciled in the State of Utah.

17. Plaintiff Cicada 3301 Metaverse, L.L.C., is a domestic limited liability company formed and existing under the laws of the State of Utah having its principal office in the State of Utah.

18. Thomas does business as, and also brings this action in the names of, Cicada 3301, Cicada 3301 Token, and Sophia Musik, all of which have their principal offices in the State of Utah (Thomas, Cicada Metaverse, L.L.C., Cicada 3301, Cicada 3301 Token, Cicada 3301 Portals, and Sophia Musik are sometimes collectively referred to below as "Thomas" or "Plaintiffs").

19. Thomas is a preeminent, award-winning, and prolific composer, pianist, and musician, who has mastered and enjoys expertise in the performance and playing of music on numerous musical instruments. He is 64 years old, and his career has spanned decades.

20. He began composing when he was four years old, has toured Europe giving concerts, and has worked with many world-famous musicians, including Hollywood television and film composer Michael A. Levine ("Levine"), opera soprano Marnie Breckenridge, New York City Opera Director Constantine Orbelian, cellist Ian Maksin, rhythm and blues composer Preston Glass, rhythm and blues singer Mr. Maph, and the Moscow Conservatory.

21. His YouTube channel, Sophia Musik, has over 103,000 subscribers, and it features 613 videos with his original music, with some the subject of over a million views. A short film features his award-winning original music; that short film, in turn, also won awards. Over the past

4

several years, Spotify, iTunes, Apple Music and Amazon have carried and feature his modern compositions.

B.

22.     In addition to his career in music, Thomas conducts the business, and is the co-founder and the sole member, of Plaintiff Cicada 3301 Metaverse, L.L.C. ("Company").

23.     Cicada 3301 is a group of creative individuals who create music, art, poetry and puzzles meant to inspire those interested in history, music, and culture.

24.     Cicada 3301's influence peaked with its 2017-2018 puzzle releases, acquiring followers numbering in the millions.

25.     The Company was originally formed with its headquarters in California as a California limited liability company. During that period, the founders registered its intellectual property with the United States Copyright Office.

26.     After conducting business in California for several years, the Company moved to Utah and was re-formed as a Utah limited liability company, as successor to the original company.

27.     The Company is the inventor and owner of the copyrighted name "Cicada 3301" and all variations, styles, and derivations of that term and brand, of which Thomas and the Company, alone, have sole, exclusive, free, and unencumbered rights. They also have copyright rights in the Cicada logo and trademark rights in the Cicada logo and in the Cicada 3301 word trademark.

28.     Thomas and the Company also operate and conduct business as, under, and in the copyrighted names of "Cicada 3301," "Cicada 3301 Token," and "Cicada 3301 Portals," which names and brands, likewise, were invented by Thomas and the Company and are the sole and exclusive property of Thomas and the Company.

29. Thomas has numerous listeners, viewers, participants, and devotees in California, Utah, and throughout the United States, including many who are citizens of the State of Michigan.

C.

30. Cicada 3301 is a philosophy grounded in spiritual health, moral, ethical, and creativity principles, focusing on the need for, and importance of, privacy, an interior renaissance, a renaissance of the arts, the uncovering and recovery of buried parts of our human history, beauty, and truth.

31. The Cicada 3301 ethos has among its pillars the belief and perception, in the broad field of natural philosophy, that God can be perceived through frequencies, sounds, and music. Its underpinnings are the beliefs and understandings of peoples of the ancient world, who used music during initiation practices, such as those in ancient Egypt, as well as the performance by the ancient Greeks of the rites of spring.

32. Other historic illustrations from which the ethos draws guidance and inspiration include: Gothic cathedrals in Catholic Europe used music to bring people closer to God with songs performed and sung for the glory of God and requiems for the dearly departed were composed for His glory; the troubadours used music as a romantic vehicle and governments over time have known, and know today, full well the power of music; and the guidance of Robert Fludd, who created his own Temple of music many years ago.

33. The belief is specific in that music is to be heard and understood as more than mere organized sound; it is, instead, a vehicle to perceive God. Communion with God through music is central to what Cicada 3301 does. This leads to awareness, as musicians and Christians, and that is why it adds orchestration and video to Thomas's music.

6

34. The power of this set of beliefs, sometimes referred to as the "Temple of Music," is grasped by a significant part of the entire audience of Sophia Musik listeners, and that is amply reflected in their comments.

35. It also borrows from strains of other religious traditions including Buddhism, in which the participant's experience - personal, ineffable, subjective, but undeniably powerful - occurs. This is comparable to the mystic experiences and ecstatic prayer of Catholic saints, or Sufi traditions, and contrasts strongly with the various spiritual traditions that focus exclusively on book-learning or scholarly interpretations of scripture.

36. The other key precept is that music is experiential. The spontaneous quality of Thomas's music draws people and allows them to share that experience of the Divine. These themes are woven throughout Cicada 3301 and Sophia Musik.

D.

37. The Company has created for Sophia Musik over 400 videos featuring Thomas's music, many with video content containing symbolism that evokes right-brain, intuitive-style perception, some with co-orchestrations, and all of which may enhance the experience of the music.

38. The Cicada code emphasizes, and provides means for, escape from the toxic culture of narcissism, and a means for personal development culminating at a state of maturity and enlightenment. It stresses the essential goal of minimizing the obsession with ego, as, it believes, that is chief among our societal and governmental problems. Among its ranks are poets, composers, artists, historians, and philosophers.

39. The ethos of Cicada 3301 has used ciphers, steganography, riddles and illusions to take the pilgrim on a journey to the rejection of fear and a renewed and more profound sense of

7

creativity. It employs the Cicada 3301 feature, which is a series of difficult, multi-layered, internet-based puzzles that may be referred to by some as an "alternative reality game."

40. The Company is operated on a for-profit basis, but it also commits a large part of its operation and resources to charitable causes, such as raising money for the impoverished and displaced women and children in war-torn countries. Although sometimes referred to as a "movement," it is non-political, utterly private movement, to the extent it may be characterized as a "movement," at all.

41. Neither the Company nor any of its representatives has any connection with any political party or public cause whatsoever; neither has any connection or affiliation whatsoever with any persons or organization advocating for the advancement of any societal cause or public or governmental law or policy or to further any political or public policy agenda. Its entire mission, existence, philosophy and activity is entirely apolitical.

42. Its entire commitment is exclusively to the spirituality and philosophy that is its only mission and purpose, as described hereinabove.

43. The philosophy, being strictly apolitical, eschews government excess and media fear-mongering. "Instead of creating paranoia or the urge to gather arms and cause a revolution, our path is one of renaissance, one of music, and beauty and art and adventure. A path of renewal, not destruction." "A flowering of mankind." This is what makes the Cicada 3301 philosophy essentially religious in nature.

44. Although the puzzles can be deeply mysterious, nothing about Cicada 3301 is "cultish," "metaphysical," "new age," or "occultist." The philosophy eschews government excess and media fear-mongering.

45.     Neither Thomas nor anyone else at Cicada 3301 has ever engaged in religious or political proselytizing; nor has anyone at Cicada 3301 ever held himself or herself out as such; nor have the Cicada 3301 projects; nor has Sophia Musik.

46.     That is because the ethos is centered on the belief that all have free will and that a person on his or her own individual life path or spiritual quest may find something of value in the music and in the videos, and by performing acts of creativity in the individual's own sphere of accomplishment, inspiring others to experience an interior renaissance, and that is their true faith, belief, and hope.

## The Parties Defendant

### A.

47.     Defendant the Trustees of Michigan State University, also known and referred to herein as Michigan State University, formerly known as the "Michigan agricultural college," "Michigan state college of agriculture and applied science," "Michigan state university of agriculture and applied science," "[t]he state educational institution at East Lansing," is a body corporate formed and existing under the constitution and laws of the State of Michigan that has its principal offices in East Lansing, Michigan.

48.     Defendants Rebecca Bahar-Cook, Mike Balow, Dennis Denno, Renee Knake Jefferson, Sandy Pierce, Brianna T. Scott, Kelly Tebay, and Rema Vassar ("Trustees"), upon information and belief, together comprise all eight of the Trustees (they, their predecessors-in-office, and Michigan State University are sometimes collectively referred below as the "University" or "MSU"). All eight of the Trustees, upon information and belief, are domiciled in the State of Michigan and conduct business in Wayne County, Michigan.

49.     "All political power is inherent in the people. Government is instituted for their equal benefit, security, and protection." CONST 1963, art I, § 1

9

50. Under CONST 1963, art VIII, § 5, the Board of Trustees of Michigan State University "shall have general supervision of its institution and the control and direction of all expenditures from the institution's funds. Each board shall, as often as necessary, elect a president of the institution under its supervision. He shall be the principal executive officer of the institution, be ex-officio a member of the board without the right to vote and preside at meetings of the board."

51. The ultimate constitutional and legal powers, authority, duties and obligations to hire, control, supervise, manage, discipline, and fire employees, including members of the administration and faculty of Michigan State University, are, and at all times pertinent to this action have been, vested in the Trustees of Michigan State University, both those named herein as parties-Defendant and their predecessors-in-office.

52. Under law, the purpose of the University is to:

provide the inhabitants of this state with the means of acquiring a thorough knowledge of agriculture and all its allied branches, of mechanic arts, of domestic art, of domestic science, of military tactics and of military engineering, and to this end it shall afford such instruction in science, art and literature as, in the judgment of its governing body, will promote the object of the institution.

No. 269 of Michigan Public Acts of 1909, Section 1.

53. The Trustees have plenary power under law to adopt such ordinances, by-laws, regulations, policies and other governing documents they may deem necessary to promote any of the objects for which the University was created to secure the successful operation of the University and to promote its designed objects. The Trustees further have the obligation faithfully to adhere to, enforce, and ensure the full and faithful compliance with and adherence to all such governing documents of the University by the President and all other officers of the University, as well as by all other of the employees, agents, representatives, delegates, affiliates, and assigns of the University.

54. The Trustees have, in fact, adopted such governing documents, as well as other governing documents including but not limited to the Faculty Handbook. They may not, however, adopt any such governing documents in conflict with law. All governing documents and promulgation must not be in conflict with the constitution or laws, including but not limited to No. 269 of Michigan Public Acts of 1909.

55. Its Faculty Handbook provides, in part, at Article III ("University Policies"):

Teachers are entitled to full freedom in research and in the publication of the results, subject to the adequate performance of their other academic duties; but research for pecuniary return should be based upon an understanding with the authorities of the institution.

56. Its Faculty Handbook further provides, in part, at Article IV ("Academic Human Resources Policies") that the faculty are:

to adhere to the highest standard of intellectual honesty [and to] conduct all research and creative activity in a manner consistent with accepted scholarly standards and in conformity with legal, professional, and University codes, policies, and regulations governing research and creative endeavors.

57. The University's Anti-Discrimination Policy, at Article III, prohibits discrimination, harassment, and retaliation against persons on the bases of political persuasion and religion.

B.

58. Defendant Kevin M. Guskiewicz is and was at times relevant to this action President of the University who, upon information and belief, is domiciled in the State of Michigan and conducts business in Wayne County, Michigan. (Guskiewicz and his predecessors-in-office are sometimes collectively referred to below as "Guskiewicz").

59. Upon information and belief, Guskiewicz holds the office of President of Michigan State University and has held that office during times pertinent to this action (Guskiewicz and his predecessors-in-office are sometimes collectively referred to below as "Guskiewicz").

11

60. As President, Guskiewicz answers directly to the Trustees of Michigan State University and has answered directly to them and their predecessors-in-office at times pertinent to this action.

61. As former Presidents of Michigan State University, predecessors-in-office of Guskiewicz answered directly to the Trustees of Michigan State University and their predecessors-in-office.

62. Defendant Heidi Hennink-Kaminski ("Hennink-Kaminski") is, and at times pertinent to this action, has been Dean of the College of Communication Arts and Sciences of Michigan State University, including the Communication Sciences and Disorders Department of the College of Communication Arts and Sciences of Michigan State University (Hennink-Kaminski and her predecessors-in-office are sometimes collectively referred to below as "Hennink-Kaminski"). Hennink-Kaminski, upon information and belief, is domiciled in the State of Michigan and conducts business in Wayne County, Michigan.

63. Defendant Prabu David ("David"), upon information and belief, was Dean of the College of Communication Arts and Sciences of Michigan State University, including the Communication Sciences and Disorders Department of the College of Communication Arts and Sciences of Michigan State University, from January 2015 through May 2023. (David and his predecessors-in-office are sometimes collectively referred to below as "David"). David, upon information and belief, is domiciled in the State of New York and conducts business in the State of Michigan.

64. Defendant Dimitar Deliyski ("Deliyski") is, and has been at all times pertinent to this action, upon information and belief, chair of the department of communicative sciences and disorders in the College of Communication Arts and Sciences of Michigan State University. (Deliyski and his predecessors-in-office are sometimes collectively referred to below as

12

"Deliyski"). Upon information and belief, Deliyski, is and was at times pertinent to this action the Chair of the Communication Sciences and Disorders Department of the College of Communication Arts and Sciences of Michigan State University, to whom Dilley answers or at times pertinent to this action answered most directly and proximately. Deliyski, upon information and belief, is domiciled in the State of Michigan and conducts business in Wayne County, Michigan.

65. Defendant Shawn Turner is, and has been at times pertinent to this action, upon information and belief, a member of the faulty of the College of Communication Arts and Sciences of Michigan State University and who, upon information and belief, upon information and belief, is domiciled in the State of Michigan and conducts business in Wayne County, Michigan.

66. Defendant Monique Turner is, and has been at times pertinent to this action, upon information and belief, a member of the faulty of the College of Communication Arts and Sciences of Michigan State University and who, upon information and belief, upon information and belief, is domiciled in the State of Michigan and conducts business in Wayne County, Michigan.

67. Defendant Laura Dilley, also known as Laura Christine Greenaura Dilley, Ph.D. ("Dilley"), is, has been, or was at times pertinent to this action, upon information and belief, a member of the faculty (Associate Professor of Psycholinguistics) of the Communication Sciences and Disorders Department of the College of Communication Arts and Sciences of the University, junior, subordinate, and inferior to Guskiewicz, David, Hennink-Kaminski, Deliyski, Shawn Turner and to Monique Turner. Dilley is, upon information and belief, domiciled in the State of Michigan and conducts business in Wayne County, Michigan.

68. As a junior and inferior member of the faculty of the Communication Sciences and Disorders Department of the College of Communication Arts and Sciences of Michigan State University, Dilley answers or answered to Guskiewicz, David, Hennink-Kaminski, Deliyski, Shawn Turner, and Monique Turner, members of the faculty and administration of the University

13

superior and senior to her, and she has at all times pertinent to this action answered to them and to the Trustees of Michigan State University, as well as to their respective predecessors-in-office not specifically identified by name herein. Dilley has done so at all times pertinent to this action, whether answerable to those specifically named as office-holders or to their respective predecessors-in-office, including David.

69.     Defendant Lisa Anne Derrick ("Derrick"), upon information and belief, is domiciled in the State of California and conducts business in the State of Michigan; upon information and belief, Derrick is acting and has acted in concert with Dilley and others with knowledge of Dilley's illegal, unlawful, wrongful, tortious, unethical, and improper conduct, malfeasance, misfeasance, and non-feasance as described herein.

70.     Defendant Paula Sue Voelkert Davis ("Davis"), upon information an upon information and belief, is domiciled in the State of Indiana and conducts business in the State of Michigan. Davis is acting and has acted in concert with Dilley and others with knowledge of Dilley's illegal, unlawful, wrongful, tortious, unethical, and improper conduct, malfeasance, misfeasance, and non-feasance as described herein.

C.

71.     Upon information and belief, as Deans of the College of Communication Arts and Sciences of Michigan State University, Hennink-Kaminski and David answer, or at times pertinent to this action answered, directly to Guskiewicz and at times pertinent to this action answered directly to his predecessors-in-office, and, ultimately, to the Trustees of Michigan State University and their predecessors-in office, as have the predecessors-in-office of Hennink-Kaminski and David, and Deliyski answers to all those named or described above.

72.     As a Professor of Practice and Professor of Strategic Communication of the faculty of the Communication Sciences and Disorders Department of the College of Communication Arts

14

and Sciences of Michigan State University, Shawn Turner answers directly to Hennink-Kaminski and has, upon information and belief, answered to Hennink-Kaminski, David, Deliyski, and their predecessors-in-office at times pertinent to this action, and he has, and has had at times pertinent to this action, the proximate authority and duty to oversee, supervise, manage, and ensure the lawful and proper conduct of Dilley within the scope of her employment with MSU.

73.     As member of the faculty of the Communication Sciences and Disorders Department of the College of Communication Arts and Sciences of Michigan State University, Monique Turner answers directly to Hennink-Kaminski and has, upon information and belief, answered to Hennink-Kaminski, David, Deliyski, and their predecessors-in-office at times pertinent to this action.

74.     As a member of the faculty of the Communication Sciences and Disorders Department of the College of Communication Arts and Sciences of Michigan State University senior and superior to Dilley, Monique Turner on behalf of the University has, and has had at times pertinent to this action, the proximate authority and duty to oversee, supervise, manage, and ensure the lawful and proper conduct of Dilley within the scope of her employment with Michigan State University.

75.     Shawn Turner and Monique Turner on behalf of the University answer directly to Hennink-Kaminski, who, in turn, answers directly to Guskiewicz, who, in turn, answers directly to the Trustees of Michigan State University; upon information and belief, Shawn Turner and Monique Turner on behalf of the University answered directly to predecessors-in-office of Hennink-Kaminski.

76.     Shawn Turner and Monique Turner on behalf of the University further answer to Guskiewicz, and, ultimately, to the Trustees of Michigan State University. They and their predecessors-in-office have been so answerable at all times pertinent to this action, whether to

15

Guskiewicz and his predecessors-in-office or to the Trustees of Michigan State University and their predecessors in office.

77.     As a junior and inferior member of the faculty of the Communication Sciences and Disorders Department of the College of Communication Arts and Sciences of Michigan State University, Dilley answers or answered to Guskiewicz, David, Hennink-Kaminski, Deliyski, Shawn Turner, and Monique Turner, members of the faculty and administration of the University superior and senior to her, and she has at all times pertinent to this action answered to them or to their respective predecessors-in-office.

D.

78.     The Trustees of Michigan State University are fully accountable under law, answerable, and liable to Thomas for all acts and omissions that are within the scope of this complaint as well as for all acts and omissions of their respective predecessors-in-office, including but not limited to acts and omissions committed by any one or more of such predecessors-in-office, individually, or done by one or more in concert or combination with each other, including but not limited to such acts or omissions alone or together consisting of, or in any way connected to, corporate action the Trustees of the University caused the body corporate to make, took, or effectuated, or failed to make, take, or effectuate, whether or not those Trustees of the University are herein specifically identified and named as parties-Defendant to this action.

79.     The Trustees of Michigan State University are fully directly accountable under law, answerable, and liable to Thomas for all acts and omissions of their own affecting Thomas that are within the scope of this complaint that are being committed or have been committed by the Trustees of the University currently holding such office as named herein as parties-Defendant, as well as those past or ongoing acts or omissions committed by, or set into motion, by their predecessors-in-office, whether prior to the date of the filing of this complaint, and whether after, during, or

16

prior to the salient events averred herein and the numerous violations of constitutional and legal duties owing to Thomas.

E.

80.    The acts and omissions of Defendants give rise to claims averred herein, whether or not solely arising under the constitution and laws of the United States, the constitution and laws of the State of Michigan, the constitution and laws of the State of Utah, or the constitution and laws of the State of California; they also do or may give rise to claims herein arising under the constitution and laws of other jurisdictions, and are actionable against Defendants and entitle Thomas to the relief requested herein, as, and to the extent, they further give rise or may be determined and adjudicated to give rise to claims arising under the constitutions and laws of other States of the United States, as the acts and omissions detailed herein were done and caused injury not only within the State of Michigan but also within the State of Utah and the State of California, and also within still other States, across state lines, as, individually or cumulatively, part of or the whole of the conduct by Defendants of interstate activities, conduct, operations, enterprises, and systematic patterns of ongoing unlawful and illegal conduct and activity.

81.    Defendants' past and ongoing unlawful and illegal activity was, has over the course of time been, and is being committed, developed, and compounded to cause injury to Thomas, and to exacerbate harm and injury to Thomas, with the design of causing and exacerbating to Thomas the very harm they have, in fact, inflicted on him.

82.    Defendants' past and ongoing unlawful and illegal activity, in fact, has caused and exacerbated, and is causing and exacerbated, great harm to Thomas. The unlawful and illegal conduct is continuing and, unless restrained by the Court or other court of competent jurisdiction, will continue; it continues to cause and exacerbate harm daily anew to Thomas, and Thomas will

17

continue to suffer harm and exacerbation of injury daily anew unless and until restrained by the Court or other court of competent jurisdiction.

83.     The Trustees of Michigan State University are further vicariously and derivatively accountable under law, answerable, and liable to Thomas for all acts and omissions affecting Thomas that are within the scope of this complaint that are being committed or have been committed by Guskiewicz, Hennink-Kaminski, David, Deliyski, Shawn Turner, Monique Turner, and Dilley, as well as other administrators and faculty members, employees, representatives, and agents of the University, including but not limited to contractors and affiliates of the University and those acting in active concert with them having knowledge or reason to know of the wrongdoing, illegality, and unlawful conduct, as well as their predecessors, for current acts, omissions, and harms, as well as those past or ongoing acts or omissions committed, or set into motion, by them and their  predecessors, whether before or after the date of the filing of this complaint, and whether after, during, or before the salient events averred herein and the numerous violations of constitutional and legal duties owing to Thomas averred herein.

F.

84.     Shawn Turner is, or was at times pertinent to this action, general manager of WKAR Public Media at Michigan State University, public radio and television for mid-Michigan, for PBS, NPR, and other broadcasters, whose broadcasts include and included classical music. He has also, since August 2019, served in the position of professor of strategic communications at the University. In March of 2020 he served a one-year presidential appointment as senior advisor to the Secretary of Veterans on temporary leave from the University. He also served as deputy press secretary under United States Presidents Barack Obama and Joseph Biden, and he serves on the boards of directors of National Public Radio (NPR) and the German Marshall Fund of the United States.

18

85.  Shawn Turner is former deputy White House press secretary for National Security, former director of communication for National Intelligence at the Office of the Director of National Intelligence, and former deputy press secretary for Foreign Affairs of the National Security Council.

86.  Shawn Turner is former national security analyst for CNN and Director of Communication for National Intelligence at the Office of the Director of National Intelligence.

87.  Upon information and belief, Dilley asked him to be her mentor for pursuing her ambition to use her role as a tenured faculty member of the University to advance her parallel career as a national political activist, radical polemicist and national media commentator, and create further opportunities for her within the intelligence community, he agreed to do so, and he served as her mentor in this regard, including but not limited to her mentor with respect to the research and writing of Dilley that is the subject of this action.

88.  Upon information and belief, Dilley and Shawn Turner had electronic communications under an arrangement for private communications covertly and outside of the authorized University electronic communication systems accessible by and authorized for members of the faculty of the University's College of Communication Arts and Sciences.

G.

89.  Shawn Turner and Monique Turner are husband and wife.

90.  Monique Turner's training and academic focus is in emotional messaging, message design and evaluation, risk perception and cognitive processing; she is the author of the "Anger Activism Model," a behavioral theory explaining when anger is constructive versus deleterious – the use of carefully-crafted language to change behavior, such as through political provocation, dogma, polemic, and propaganda. She is an expert in how to incite anger in a subject with the

effect of causing the subject to focus and direct that anger toward a third party to take action against or concerning that third party and to sway public opinion.

91. Hennink-Kaminski, David, Keliyski, and Shawn Turner, upon information and belief, knew or should have known of the research work of Dilley that is the subject of this action before Dilley undertook to do the research and writing, and they supported and endorsed the work even though Dilley had warned them of the subject matter and that the subject matter, research and writing would be "controversial."

92. Upon information and belief, they permitted and caused Dilley to move forward with and complete her research project, and they approved her work and publications on behalf of the University. Upon information and belief, both approved funding for that work.

## Jurisdiction and Venue

93. The amount in controversy in this matter exceeds Twenty-Five Thousand ($25,000.00) Dollars, exclusive of costs, interest and attorney fees, and Plaintiffs assert claims for equitable relief.

94. This Court has jurisdiction over all parties and claims in this action.

95. Venue is proper in this Court.

## Allegations Common to All Counts

96. Plaintiffs incorporate by reference as though fully set forth herein all averments above.

### A.

97. In her role, authority, capacity, and, alternatively, outside of that role, authority, and capacity, and in her individual capacity, and together with or with the help of, authority of, or at the direction or imprimatur of, the University, Dilley authored, and the University and its agents and representatives identified or described above, in their respective official capacities, or,

20

alternatively, outside of their respective official capacities and in their respective individual capacities, authored, or, alternatively, without such help, authority, direction, or imprimatur, published, caused to be published, or permitted to be published to be published on the Internet and otherwise, a paper entitled "QAnon Propaganda on Twitter as Information Warfare: Influencers, Networks, and Narratives," along with the publishing of other works and communications described herein, as well as other works and communications not described herein, as such publications and communications are being made each continuing day or other period of time through the present, and Defendants threaten imminently to continue to do so in the future without intervention by this Honorable Court.

98. The authors and publishers of that particular paper were and are listed as "Laura Dilley, William Welna and Faith Foster, Department of Communicative Sciences and Disorders, College of Communication Arts and Sciences, Michigan State University, East Lansing, MI, United States."

99. The "ETHICS STATEMENT" states : "Written informed consent was not obtained from the individual(s) for the publication of any potentially identifiable images or data included in this article."

100. The section entitled "FUNDING" states: "We gratefully acknowledge support from the Dept. of Communicative Sciences and Disorders and the College of Communication Arts and Sciences at Michigan State University."

101. The University compensated Dilley for the work; and peer reviewers were compensated by Dilley to approve of the work.

102. The University and Dilley ended up "self-publishing" it on the Internet (via the arxiv.org database hosted by Cornell University) and promoted it widely and repeatedly on social media.

103.    The paper contains false and outlandish allegations of and concerning Thomas Schoenberger, such as that he was the mastermind behind QAnon, that the Cicada 3301 alternate reality game (puzzle) is a direct link with QAnon, and that Thomas belongs to the "IAM Cult." (QAnon was allegedly a quasi-political theory, conspiracy theory, concept, or movement concerning the dissemination of cryptic messages on the Internet, earning the label of "domestic terrorist organization" from the Federal Bureau of Investigation.)

B.

104.    On behalf of the University, Dilley thus used her position, prestige, and influence as a tenured University professor to gather a large audience for the paper. She later gave a public presentation of her "research" to a University-sponsored colloquium. She later caused to be available on the Internet a video presentation of her oral reconstitution, highlighting, and amplification of her views concerning the paper, which were equally if not more injurious to Thomas. Alternatively, Dilley did so outside of the authority of the University and not on behalf of the University.

105.    Defendants' promotion of the paper resulted in magazine interviews, a University-sponsored public lecture, and at least 44 tweets calling the paper "professional" and "peer-reviewed." Alternatively, Dilley did so and continues to do so outside of the authority of the University and not on behalf of the University. Since those times, Dilley continued, has continued, threatens imminently to continue, and, without judicial intervention will continue, to publish and communicate like injurious statements and other communications injurious, to Plaintiffs, with malice, knowingly, intentionally, wickedly, recklessly, grossly negligently, negligently, and otherwise.

106.    Notwithstanding demands Plaintiffs have made on Dilley to refrain from doing so, Dilley continued, has continued, continues to do so, and threatens imminently and indefinitely in

22

the future habitually and customarily to do so, and she otherwise has failed and refused Plaintiffs' demands that she do so.

107. Notwithstanding demands Plaintiffs have made on Defendants other than Dilley, as well as others with knowledge acting in active concert with Dilley or with one or more other of Defendants, to refrain from doing so, and to restrain, prohibit, and discourage Dilley from doing so, and to refrain from aiding, assisting, encouraging, permitting, or otherwise endorsing, supporting, or abiding her doing so, Defendants have failed and refused to do so, and Defendants continue to fail and refuse to do so.

108. By way of further illustration, Dilley, on behalf of the University, later induced writer Tom Porter to author an article that was another iteration of the paper, just as false and injurious to Thomas as the previous versions, on the digital publication of *Business Insider* on the Internet. Alternatively, Dilley did so and continues to do so outside of the authority of the University and not on behalf of the University. Alternatively, Dilley did so outside of the authority of the University and not on behalf of the University.

109. In addition to *Business Insider*, she also gave interviews to *Rolling Stone* and *The Financial Times*, all in furtherance not of scholarship but of her partisan political activism.

110. The University also republished versions of the text of the paper and of Dilley's oral presentations on the University's own website, and it has done so repeatedly. The University promoted the paper on multiple platforms, continuing to carry some version of the text to this very day.

111. Of Dilley's 158 academic publications, this is the only article Defendants have cause to be published, revised, and re-published in original and varied forms so extensively.

112. The University and Dilley later published, caused, or permitted to be published, a second paper, related to the first, under the name of "Dr. L.C. Dilley, Dept. of Communicative

23

Sciences, Michigan State University," entitled "The memetics of QAnon as dynamical system: A historical and forensic analysis Katz-inspired diffusion of pro-QAnon sentiment among social media micro-influencers 2017-2019." That paper largely focuses on "memetic affordances of Cicada 3301 impacting QAnon's diffusion."

113. That paper, likewise, falsely names Thomas, specifically, falsely labels him as a QAnon "enabler/supporter" and implicates him in "religious discourse" embraced by President Trump as "a form of weaponized political communication that aims to undermine democracy." *Id.* at p. 16.

> We further found evidence that at least some of these influencers viewed Cicada 3301 also as a kind of cyber-religion. For instance, Jim Blake said "There is no way Cicada 3301 and Vault Seven are not linked *unless God is using Cicada as a vehicle of information and prophecy.*" This is significant, because while socially accepted religious beliefs do not well correlate with conspiracy beliefs, paranormal and apocalyptic beliefs do (Robertson & Dyrendal, 2018). President Trump's embrace of this kind of religious discourse – a similar sort of which seems to have permeated discourse around the QAnon-linked Cicada 3301 puzzle – can be considered a form of weaponized political communication that aims to undermine democracy (Bond & Neville-Shepard, 2023).

*Id.* at p. 22 (emphasis in original).

C.

114 Dilley calls Cicada 3301 a "cyber-religion." "[A] New Cyberreligious Movement is a unique product of the web's inherent deep structures . . . the very idea of the New Cyberreligious Movement corresponds quite well to the core ideology of the Cicada 3301 mystery." *Id.* at p. 7 (quoting Andjelkovic (2021, at pp. 2021)).

115. Dilley further falsely describes Thomas as one of the top two "digital mercenaries" engaging in "deception, incentivization, and coercion" and working closely with experts in "psychological warfare methods" to "spread QAnon narratives" in U.S. politics and worldwide, even going so far as to implicate him in "cybercrimes." *Id.* at pp 8, 22.

116.   On February 13, 2023, while a man was in the process of using a firearm to kill people on the campus of the University, Dilley falsely and maliciously posted on X (formerly known as "Twitter") that the gunman was acting under the control of Thomas; at the time Dilley knew or should have known that such scandalous statements would have had the potential of inciting in third parties violence, including the prospect of moving them to take vigilante justice out against Thomas, his family, friends, and associates.

117.   Dilley's false accusations against Thomas, asserting that he was the force behind the shooter, coupled with her other false publications accusing Thomas in previously repeatedly published "peer reviewed" papers and other publications of being the leader of a domestic terrorist group, most certainly subjected Thomas to physical harm, up to and including death, and it has caused him and his loved ones great continuing emotional harm. Dilley has communicated to third parties numerous or innumerable other slanders, libels, and defamatory communications injurious to Plaintiffs, continues to do so from day to day, of which Plaintiffs are learning of only on a day-by-day basis, if at all, and she will continue to do so unless restrained in the judicial process.

D.

118.   Defendants, either in their official capacities or outside of their official capacities and in their individual capacities, have continued a pattern of unrelenting attacks on Thomas's character since the initial scandalous publication, as well as other verbal attacks against Plaintiffs and other wrongful conduct against Plaintiffs as detailed herein, and those attacks continue, almost daily, to this very day.

119.   Quotes of Dilley's works include the following statements about Thomas:

[T[the findings of our scientific paper" are "highly relevant to the Jan. 6th Committee proceedings" ... "the mastermind behind Qanon" ... "a digital mercenary" ... "a fully-discredited scam, grift, & dangerous radicalization tool that promotes Nazi ideology" ... "groomed and enlisted some [puzzle solvers] to post as Q" ... "IAM cultist" ... "wage war on democracies" ...

25

120. Dilley repeatedly portrays Cicada 3301 as a cult and Thomas as the leader of that cult acting as no less evil than a Svengali to manipulate the masses through use of memetics and otherwise. In that role, she portrays him as:

A. A secret, subversive, divisive, racist, antisemitic, far-right and alt-right extremist, white nationalist, conspiratorial ideologist, implementer and promoter of connecting people to fascism and the alt-right in QAnon through "brainwashing," magical thinking, the occult, and alternative reality games grounded in cognitive psychology, "grooming and enlisting some participants to post as Q";

B. A perpetuator of white extinction and white replacement narratives, fascist, booster of Republican propaganda, disinformation, conductor of information warfare, promoter of the ostracism of Democrats, liberals, and the elite;

C. Engaging in the proselytization of the masses via the internet to adopt geopolitical and other stances, including X, as well as a violent January 6, 2021 U.S. Capitol insurrectionist, closely connected to the "'I Am' theosophy cult," connected to tweets about "baby sacrifice and adrenochrome" and Nazi symbolism, esoterics, and psyops;

D. A "QAnon Insider" who "retweeted a Qdrop and referenced "information warfare" and "death."

121. Dilley repeatedly publicly asserts that Thomas practiced and practices all of the above through the invention and implementation of a highly-organized "digital astroturfing" regiment to effect, through deceptive persuasion, mass thought control – all with the ultimate goal of political dominance, and soft power, evils leading up to and including nothing less than "genocide." (This is not an exhaustive list of the dozens of aspersions Defendants have cast and continue to cast on Thomas.)

122. Dilley falsely accused and accuses Cicada 3301 of invoking "the relevance of Discordianism, a 'religion' invented in the late 1950s that purposefully 'liquifies' the boundaries between the sacred and profane."

123. During the February 13, 2023 mass shooting at the University's East Lansing campus, Dilley tweeted that she was "targeted through stochastic terrorism tactics for my research

26

on Qanon disinformation...Remains to be seen if there is a connection to the active shooter situation at Michigan State University... A reminder that Cicada 3301 is a thoroughly discredited, dangerous internet puzzle run by a slick con man, Thomas Schoenberger..." She did so while the shooting was underway. This tweet got over 20,000 views.

124. Others amplified this lie, saying "The Cicada game...is a piece of the jigsaw of Fascist stochastic terrorism that is the Qanon disinformation & mass delusion attack."

125. According to Defendants, themselves, the pre-publication abstract had 4,706 views. Dilley's 44 tweets calling the paper "peer-reviewed" received 1427 retweets, 179 quote tweets, 2,596 likes, and 389 bookmarks. Dilley's lecture about the paper has 767 YouTube views. An official University twitter thread on Dilley's lecture had 274 re-tweets, 51 quotes, 603 likes, and 118 bookmarks.

126. Defendants have never contacted Thomas to ask him for his point of view in rebuttal of these numerous slanders, knowing full well that, had they done so, he would have given them an unequivocal, universal, categorical denial of the allegations across the board. On the other hand, Thomas has sought on numerous occasions to communicate with Defendants to correct the record, only to be utterly and uniformly ignored.

127. The University greatly profits and benefits financially from Dilley's research and publications. Dilley is a prolific author with hundreds of published research articles. Her CV is 30 pages long. She is a preeminent speaker in her field and was keynote speaker at a national conference on psycholinguistics. Her prominence brings the University numerous research grants, alumni donations, and tuition income by motivating enrollment.

E.

128. While creating her papers, Dilley formed a romantic relationship with graphic designer and podcaster, Arturo Tafoya of Ensenada, Mexico, then a detractor of Thomas, from

27

whom she learned of Thomas and his connection to Cicada 3301. Dilley tweeted gushing admiration for Tafoya's research and praised him as the source of the most important background information underpinning for her research paper.

129.   Tafoya and Dilley became engaged and planned to marry. They also established a business partnership and agreed to co-author a book or books together. During this partnership they shared "research data." For one example, Dilley gave Tafoya a hard drive marked "Property of MSU" containing some of her data. On October 28, 2023 Dilley tweeted that she was writing a book about Cicada 3301 and QAnon, which she hash-tagged "#ThomasSchoenberger."

130.   The partnership included creating an Etsy store and LLC that sold Tafoya's artwork. Among the artwork sold there was Cicada 3301-themed merchandise. Tafoya and Dilley planned to exploit Thomas's Cicada 3301 brand while simultaneously destroying his life.

131.   Tafoya and Dilley traveled to Austria together for a meeting with a documentary film maker and with two other individuals who also had demonstrated animus for Thomas. This meeting was intended to expand the reach of Dilley's false allegations about Thomas.

132.   In the fall of 2023, Tafoya and Dilley became estranged without having married. After he turned away from Dilley, Tafoya published archives of data he had captured over a period of years. In October 2024 Tafoya published a March, 2021 direct message dialogue with Dilley on X, in which Dilley invites Tafoya to review a draft paper and tells him that Thomas and Cicada 3301 are a narrative focus. Her April 27, 2021 direct message expresses a predetermined intent to target Thomas and Cicada 3301 without cause. It was then, October 2024, that Thomas learned that Dilley had interviewed multiple people including other detractors of Thomas who had also, in turn, published false allegations about Thomas.

133.   Among the data were emails Dilley wrote to other academics in which she stated her intent to use her tenured associate professor position with the University to pursue her personal

28

political agenda and to promote her political ideology as an agent of the University, at times holding herself out not only as an academic but as a "journalist" and a "reporter."

134.    Dilley also infiltrated the circle of Thomas's former associates-turned-detractors, Beth Melissa Blackburn Bogaerts, Derrick, James Stewartson, Davis, and Cory Michael Daniel aka ThePhoenixEnigma aka brujo2u to foment additional false facts of and concerning Thomas to aid her in her vicious campaign to discredit and destroy Thomas.

135.    Dilley has conspired with Derrick, a woman who was the longtime on-again off-again girlfriend of Thomas's brother, Stephen Schoenberger, Ph.D. Dilley even sought legal advice from Derrick (a self-described witch, professional sorceress, and black magic practitioner who is, upon information and belief, is the subject of a California court order sanctioning her for doing so), and, to conceal her  wrongdoing, Dilley even went so far as to obtain a signed nondisclosure agreement from Derrick.

F.

136.    After Dilley received a demand from counsel Thomas retained after he learned of the past and ongoing aspersions Defendants were making against Thomas, Bogaerts advised Dilley to destroy incriminating evidence. Although Dilley maintained that she was protected under her apparent (also false) "journalist privilege," she nevertheless proceeded to destroy material evidence in the plain and deliberate obstruction of justice, in order to conceal fraudulently her and other Defendants' malfeasance, consistent with the pattern and practice of the University to destroy, conceal, and withhold relevant evidence from victims of their wrongdoing and their attorneys and agents.

137.    Dilley illegally accessed and invaded Tafoya's Gmail account and deleted incriminating emails and other evidence that Thomas could have used against her in this action. Again, this occurred shortly after Dilley received the demand letter from Thomas's attorneys.

29

138. While Defendants never responded to the demand letters, Dilley, publicly to taunt Thomas, shamelessly published the demand letter, mocked it, and made fun of it on X with one of her numerous public tweets against Thomas.

139. Dilley knew or should have known that Tafoya was biased against Thomas and, regardless, had no qualifications as a researcher and he had repeatedly demonstrated animus and a personal thirst for vengeance against Thomas. Although she relied on Tafoya's data, she now discredits him completely and steadfastly maintains that he is to be disbelieved.

140. Dilley co-author, William Welna, was a member of an activist group known as "Anonymous." Welna has since publicly disavowed and distanced himself from the article, stating he had no hand in its conclusions, nor any prior knowledge that the article would end up being a personal attack on Thomas, and with him being named 59 times in the whitepaper.

141. Dilley's other co-author credited on the paper, Faith Foster, is a former University undergraduate student Dilley also employed by and representing the University.

142. The paper contains a statement that Dilley relied on Tafoya's research. It also contains a statement that the University published those works even though the University never contacted persons named in them to confirm or check facts and assumptions of fact asserted in them, or to seek to obtain any balanced perspective or to obtain informed consent.

G.

143. In June 2024 Dilley gave a lengthy YouTube interview to the Opperman Report in which she admitted that before publishing the paper, she made her dean and department chair aware that it was "controversial" and got the University's imprimatur on her scandalous works falsely branding Thomas as a radical, right-wing or "alt-right" QAnon leader and operative, so contorting his religious beliefs and spiritual philosophy, notwithstanding that they were apolitical

and utterly lacking in any ideological or political content, and its approval and funding and other support to proceed on behalf of the University.

144. That interview is just as falsely injurious to Thomas and his reputation, if not more so, than her previously-published false works concerning Thomas.

145. Dilley's inner circle includes people who have asserted their intent to steal intellectual content from the Cicada 3301 circle Thomas manages with others, and to acquire Cicada 3301 as an already well-established, influential platform with which such would-be thieves might conduct further psychological operations under cover of being a group of creatives.

146. Upon information and belief, QAnon was a psychological operation designed to manipulate the public. Dilley made herself, and her allies and privies, including, upon information and belief, one or more Defendants, made themselves and aided Dilley in making herself, willing participants in the effort of those actually running the QAnon psyop falsely to finger, frame, and blame Thomas and Cicada 3301 as being the force behind QAnon to deflect attention away from those actually running the QAnon psyop.

147. In furtherance of this scheme, they took elements of Cicada 3301 and wove them into Q drops to make it seem like Cicada and Q were connected in some way, which, of course, was and is utterly false.

148. With and by using research from an unqualified researcher and working in concert with these nefarious individuals in a manner unethical, unlawful, illegal, and, quite possibly, criminal, Defendants acted in a wicked and extremely malicious manner.

149. In so doing so, Defendants only exacerbated and perpetuated the wrongdoing of Tafoya and others who had previously threatened and libeled Thomas and who had paid compensation to Tafoya in exchange for such lies in order to sensationalize and draw the greatest amount of public attention to this radical political and ideological work of the University

notwithstanding the diminishment of the constitutional, statutory, civil, political, expressive, religious, expression, and other rights of Plaintiffs.

H.

150. In her published self-identifying personal information on her X account, Dilley prominently holds, or until recently has held, herself out as a representative of the University, and she also misappropriates and also doubly identifies herself by the handle "#Cicada3301."

151. Dilley has, at times relevant to this action and until recently, habitually tweeted in the name of the University, and Defendants knew or should have known she has been doing so. Defendants did so either in their official capacities or outside of their official capacities and in their individual capacities.

152. Specifically, Dilley tweets and has tweeted as a representative of her employer, MSU, using the handle and profile of "MSU Associate Professor of Communication Science Laura Dilley, https://twitter.com/laura_greenaura" and the handle https://x.com/ProfDilley declaring her credentials and professional affiliation with Michigan State University: "Scientist studying speech/language, cognitive neuroscience, & disinformation/QAnon. Michigan State U. MIT/Harvard alum. #Neurodiversity." Defendants were directly and actively involved in controlling and promoting Dilley's QAnon paper and other related works falsely injuring Plaintiffs.

153. The University's Center for Interdisciplinarity (MSUC4I), acting as an agent of the University, conducted a parallel social media outreach during Dilley's initial public lecture about her paper, capturing audience questions and posting Dilley's answers. Such outreach exacerbated the falsehoods against, and injuries to, Thomas.

I.

154. The University has a now well-known habit, custom, pattern and practice of concealing relevant evidence and engaging in malicious cover-ups.

155. The most prominent examples of this pattern, practice, custom, and policy of fraudulent concealment includes its recent cover-up of the Mel Tucker (former University head football coach) – Brenda Tracy sex harassment scandal.

156. Less recent, but more highly and widely publicized, is the scandal surrounding the protracted rounds of fraudulent concealments of the severest of criminal acts and other wrongdoing that the University has experienced is the case of Larry Nasser (former University women's gymnastics team physician) – a complex, involved controversy involving multiple sexual molestation and abuse scandals over the course of many years.

157. The University's cover-up and fraudulent concealment practices in the present case are consistent with, if not identical, to such past cover-ups in which it has shamefully engaged in profound and knowing and fraudulent breaches of the public trust and violations of civil and criminal laws.

J.

158. In addition to her aiding in the fraudulent concealment, Dilley has mercilessly continued secretly to enlist internet "trolls" anonymously to taunt, harass, and terrorize Thomas, tormenting and traumatizing him, and even triggering others to threaten his life. She also has continually, to this very day, sent tweets casting still additional aspersions against Thomas. Defendants' campaign to discredit and destroy Thomas has included its utilizing of the UndueInfluenceWatch.org public relations firm to promote Dilley's work against Thomas to various mainstream media outlets, including Rolling Stone magazine. Defendants also have worked together with Stewartson (another notorious internet troll) and Tafoya to target Thomas.

159. Dilley intended to inflict harm on Thomas from the start, and she admitted as much in a conversation with a witness, scheming to produce "more reports that will cause Thomas to

want to go and hide in the forest for a few days-- try to hide in the desert like he did when my paper came out."

K.

160.     In connection with Defendants' several false and scandalous communications catalogued in detail above, unknown parties hacked into Thomas's computer systems, accessed, misappropriated, and destroyed important digital data and other electronically-stored information.

161.     Upon information and belief, Dilley engaged in this intrusion, caused, or permitted such intrusion directly or through those acting in active concert knowledgeable of the improper purpose and effect.

162.     As a direct and proximate result of Defendants' extensive and malicious pattern of repeated, continuing, wrongdoing, particularized above, vigilante internet trolls and other proxies and agents of Dilley, at her direct incitement to engage in injurious acts against Thomas up to and including taking the law into their own hands to put Thomas's very life in peril (including Dilley's false, extraordinary, and outrageous accusations that Thomas engaged in mass murder on the University's East Lansing, Michigan campus) carried out such intrusions into, and misappropriation and destruction of, such property rights and privacy interest of Thomas.

163.     Dilley's own notes demonstrate her work to develop what evolved into her foul scheme to publish her QAnon whitepaper demonizing Thomas. Those notes constitute her own admission that she developed phony back-up research that was neither truthful nor objective. It reveals her plotting against Thomas was motivated maliciously and solely by her zeal to further her own personal political and ideological agenda, to demonize the political right. It shows that she purposefully selected Thomas as the principal target of her naked, radical political activism, even though Thomas does not involve himself in politics and never has done so.

164. Dilley idealizes herself a firebrand destined to foment widespread resistance to, and the ultimate defeat of, QAnon and all that that term implies.

165. It cannot be honestly or reasonably disputed that Dilley's so-called academic and peer-reviewed "research" was not done with an eye toward a neutral sociological hypothesis later borne out by Twitter metrics. Indeed, she has readily acknowledged and volunteered that such scholarship is beyond her area of expertise and not something on which she is competent to comment authoritatively or even credibly. Rather, Dilley used (and abused) Twitter data *after* deciding on the topic and conclusions her paper would reach, resolving to sanitize, by whatever means possible, honest or not, whitewash her personal political views, and make them appear "scientific" under a cloak of false legitimacy.

166. Her design was to do so, and she, in fact, did so, behind and shamelessly exploiting to her selfish benefit, the prestige and power of the State of Michigan and the University. Indeed, she did so with the imprimatur, and through the work and express endorsement and support, of the University and all Defendants.

L.

167. Dilley's own words belie any possible suggestion that she has engaged in her campaign against Thomas for wholesome, objective, purposes of scholarship. Instead, she admits it is a product solely of her subjective zeal to effect societal change through dangerous, radical, ideological extremism on the left to battle against what is -- apparently in her own mind, at least -- opposing radical ideological extremism on the right. She is and sees herself plainly as an ideological zealot against the right. As amply demonstrated herein, she would do so, and, in fact, she did so, to win at any cost – even if she had to put that entire cost on apolitical Thomas and Cicada 3301 to achieve her victory.

35

168. Dilley admits that, because, in her role on the faculty of the Department of Communicative Sciences and Disorders, College of Communication Arts and Sciences of the University (as Associate Professor of Psycholinguistics), she is qualified and focused only on the specialized field of knowledge known as "language science and cognitive science."

169. Thus, she lacks the credentials and competency to publish adequately, let alone authoritatively, on QAnon influencers. She confesses she has no expertise in that area.

170. The subject of "computer-mediated communication" is "not [Dilley's] scholarly area of expertise" and "not [her] home academic turf."

M.

171. Her purpose is not academic integrity for the sake of advancing knowledge, but using her "power of tenure" for zealous, political activism. That is, to create and publish polemic "to combat this dangerous [QAnon] propaganda and its deleterious effects on societies," she freely admits.

172. Her goal was not to advance scholarship but to "take a stand" in the area of partisan American politics.

> . . . I have been studying and researching QAnon on Twitter since 2020, based *entirely* out of concern for the dangers of this sort of propaganda/disinformation on the fabric of society and election integrity in the run-up to the 2020 presidential election and beyond. . . .

> I come from an interdisciplinary perspective focusing on language science and cognitive science. Thus, computer-mediated communication is not my scholarly area of expertise. . . .

> . . . .

> . . . I have approached this prospect with some trepidation because Communication, as a field, is not my home academic turf; instead, it's language/speech and (neuro)cognitive sciences. A main obstacle to achieving publications is my lack of knowledge of the specific theories that Communication scholars concern themselves with and knowledge of the communication field as a

whole (since linguistics and clinical speech/language tend to not fall under "communication" in academia).

. . . I am so sad for what is happening in Afghanistan right now, just as I am very sad for what has happened in the U.S. recently, including on Jan. 6, 2021. In fact, I'll mention that I was interviewed for Business Insider for their Jan. 6, 2022 story about Twitter's failure to crack down on QAnon . . . .

. . . I got tenure in 2016 and had decided at that time that, with that post-tenure status, I wanted to *use my "power" for the greatest good possible*, where that might mean that following topical importance might take me out of my disciplinary "comfort zone" and might require my *taking a stand on controversial matters*. In studying QAnon, I care far less about "making an academic name" for myself in a completely new discipline than I do about trying to *do what I can to combat this dangerous propaganda and its deleterious effects on societies*. . . . .

. . . [A]gain, I am aware of my limitations as a scholar coming from outside the communication discipline to know with confidence what framing or information would most appeal to scholars who have ICA [International Communication Association] as a primary professional organization.

Dilley's October 23, 2022 email correspondence to Drs. Dastgeer and Thapaliya on the subject of "Research on QAnon." (Emphasis added).

N.

173.    Dilley worries QAnon propaganda will lead to "genocide."

174.    Dilley portrays herself as nothing less than a necessary barrier between QAnon propaganda and genocide. Her fear of QAnon does not end with "mere" genocide. She worries that QAnon propaganda will even lead to the absolute destruction of "all humankind." She fears for her own life, fearing imminent death solely because she, personally, is one of the "members of the elites and members of the Democratic Party," whom QAnon propogandists target as "villains" from which "fortunately the hero Donald Trump would have secretly saved the world."

175.    Dilley likens QAnon propaganda to "the kind of rhetoric that probably accompanied the Salem witch trials."

37

176. Additional words of Dilley, herself, make it plain that the animus behind the beginning of her campaign to destroy Thomas – which animus only continues and grows to this very day and into the future until he disappears permanently – was, is, and will be, to respond in kind to right-wing pro-Trump QAnon partisan political propaganda by fighting it with her own left-wing, anti-Trump partisan political propaganda.

177. The advantage goes to her in the end, as she had and will have had behind her the very power of the State of Michigan, to which the "QAnon Influencers" would be no match, as a mere cadre of secret, anonymous "internet trolls" armed with only the vehicle of "astroturfing."

178. In response to the question, "Why did you start dealing with the QAnon phenomenon?" Dilley recently said, publicly:

> During my research career, I have procured numerous multi-million dollar research contracts for the universities I have worked for. While the medical-scientific achievements of this work have been highly motivating for me, with the achievement of promotions and career, I have gradually focused more and more on research topics that I consider urgent for our time and that some consider risky or controversial. I think we can agree that the enormous abuse of technological tools for online communication is one of the most pressing and perhaps even existential problems for humankind. We are faced with a dangerous situation in which millions of people around the world believe things that are not based on reality, things that are basically fabricated. This is because falsehoods have been arbitrarily spread on the Internet through the media mainly to gain political advantage. This has led to so many people having a QAnon conspiracy-oriented mindset.

179. In response to the question, "Even if the readers who follow us are familiar with QAnon, can you try to summarize in a few words what this phenomenon is?" Dilley said:

> As we know, QAnon is a conspiracy theory that originated in the US with anonymous posts on the internet portal 4chan in 2017. The main core of the narrative is that members of the elites and members of the Democratic PartyThey [sic] would be Satanist pedophiles, but fortunately the hero Donald Trump would have secretly save the world from these *villains*. Having grown up in the so-called *Bible Belt* area of the USA, I am very familiar with the narratives that paint Democrats as the devil.
>
> When I became aware of the QAnon narrative, I was very worried because it immediately seemed to me the kind of false narrative that can easily take root

38

and, as history has shown in the past, even lead to genocide. Who can represent the elite in the QAnon setting? For example, is someone with a Ph.D. like me? In times of political turmoil, polarization and dehumanizing rhetoric can easily lead people to violence. Think, for example, of what happened in Cambodia with the Khmer Rouge who purified the country of intellectuals.

180.    In response to the question, "So this concern of your has somehow encouraged you to delve into the QAnon phenomenon?" Dilley said:

. . . . Yes. I was very concerned about the extreme rhetoric related to the QAnon narrative and the implicit dehumanization. It reminded me of the kind of rhetoric that probably accompanied the Salem witch trials. I listened to all this in the context in which as an academic I had dealt with Donald Trump's computational propaganda put in place during the 2016 US presidential election and subsequently with BREXIT and the scandal involving Facebook with *Cambridge Analytica*. . . . Like so many other people, I spent a lot of time online and kept seeing not only all this bizarre pro-Trump propaganda, but also patently false narratives and claims related to variations on QAnon rhetoric. The traffic on Twitter and the ways in which the accounts fueled these issues seemed to me very planned and systematic and so I began to study the spread of QAnon propaganda on Twitter. This commitment then turned into an academic research article that collected several studies on QAnon propaganda on Twitter examining tweets from about mid-summer 2020 until January 6, 2021, the day of the assault on Capitol Hill in the USA.

181.    In response to the question, "Can you summarize the highlights of your article without obviously going into too much detail?" Dilley said:

. . . [W]e found numerous evidences of *digital astroturfing*, i.e., artificial amplification of QAnon accounts as part of a well-structured and coordinated disinformation campaign. . . .

. . . [T]he application of data science and methods of analysis of the network of connections even show that a couple of Twitter accounts were a large hub and connection core between numerous types of other accounts with a large amount of data traffic between all of them. As types orbiting around this nucleus, I can mention, for example, Twitter accounts linked to cults such as "I AM" or close to it, accounts supporting QAnon artificially amplified, troll accounts promoting disinformation and ARG (Alternative Reality Game including CICADA 3301) accounts of far-right extremists and anti-Semites and, as already mentioned, accounts linked or aligned with Russian propaganda.

"QAnon astroturfing – Interview with Laura Dilley," (CICAP, March 8, 2022)(italicized emphasis in original, bold emphasis added).

O.

182.   In the fall of 2024, Tafoya received an email that purported to be from the University's general counsel, Brian Quinn, demanding that Tafoya destroy communications between Dilley and him and all notes of such communications under the University's "document retention policy."

183.   The legitimacy of that email was later called into question on suspicion that it was a forged, phony, counterfeit communication of unknown source, although, upon information and belief, it likely came from Dilley, as the she was the person having the most direct and strongest motive to do so.

P.

184.   Upon information and belief, before November 2024, and as early as 2019, Dilley was formally diagnosed with a mental disability that compromises her judgment and perception and required her to undergo psychiatric examination and drug-testing in 2018-2019 as court-ordered in a custody case regarding her children.

185.   Dilley was diagnosed with psychosis, after which she tried to distract from the consequences of this diagnosis by rebranding herself as a "neurodivergent autist" and an ally of neurodivergent people, while simultaneously targeting one of the most neurodivergent individuals living, Thomas Schoenberger. Dilley continued to serve on the University faculty, using that role to turn her psychotic rage on Thomas, without any checks or intervention by the University to control and reign in such wrongdoing and lawlessness.

Q.

186.   Since the time she completed her lengthier works on QAnon propaganda intentionally disparaging and defaming Thomas, Dilley constantly and continuously has re-published and has posted and re-posted messages directing readers to her online works defaming

40

Thomas, as well as tweets, messages, posts, and other electronic communications taunting, harassing, falsely portraying, and personally attacking, by *ad hominem* assertions, arguments, insults, misrepresentations of fact and image in words, graphic depictions, and otherwise, vituperations and invectives of and concerning Thomas.

187. By way of example and illustration, only, and not by limitation, on October 28, 2023, Dilley posted on X that she is writing a non-fiction book about #Cicada3301 #QAnon and #ThomasSchoenberger. "Prof. Laura Dilley: My Story (A Preview) Cicada3301 & QAnon #Cicada3301 #QAnon #ThomasSchoenberger." Numerous such communications have followed, up until the very date of the filing of this complaint.

188. Also on October 28, 2023, Dilley posted on X the false statement: "Under the looming spectre [sic] of internationally-known con-man Thomas Schoenberger who co-opted Cicada 3301, Prof. Dilley and Arturo/Lestat Fall in Love & join forces, ostensibly toward fighting disinformation."

189. On November 11, 2023, Dilley posted on X the false statement: "Anyone who cares about the facts of credibility of the actors in the QAnon and Cicada3301 space should... be interested in my personal story..."

190. On November 18, 2023, Dilley posted on X the false statement: "Thomas Schoenberger's then-girlfriend's Twitter account was mathematically the single most influential account in the entire QAnon-themed network sample of accounts in Study 4."

191. On December 8, 2023, Dilley posted on X the false statement that Sophia Musik's premiere of Oculus/Leo (video content created by Arturo Tafoya) "Absolutely surreal. Such a dark plot twist, it's mind-blowing"

192. On January 4, 2024. Dilley writes to Shawn Turner blaming "Russian-affiliated propagandists" for her QAnon paper being rejected by Frontiers in Communications; falsely

41

stating "Cicada 3301 was gamejacked by a chaos agent named Thomas Schoenberger"; that Thomas is associated with Steven Biss who is lawyer to Russia-connected congressman Devin Nunes"; and of "evidence of Schoenberger and his associates' applying, in 2017 and 2018... apparent extortion- or racketeering-like tactics on YouTubers."

193.    On January 16, 2025, Dilley appears on a livestream of over thirteen hours entitled "The Evidence Speaks for Itself" on Jesse and Paula Davis's "SewerTown" Rumble channel to talk with Jesse Davis, Paula Davis, Daniel Doud, and others, about Thomas, stating "Tommy boy, stop being stupid." Davis and Doud brandished guns at the camera.

194.    On February 14, 2025, Dilley states, "Amazing stream last night. Thank you for your important efforts" in reply to a YouTube stream entitled "Liars, Stalkers, Cicada 3301."

195.    On April 3, 2024, Dilley mocks demand from Thomas's counsel, Binnall Law Firm, in response to demand letter it sent on Thomas's behalf, tweeting "LAWFARE ALERT. To watchers of Thomas Schoenberger, the #QAnon-adjacent person who claimed he's behind famous internet puzzle #Cicada3301, I received April 1, 2024 (!) a 'demand' letter," and Dilley tweets that the demand letter is "narrative sci-fi/fantasy style fan fiction."

196.    On April 14, 2024, Dilley tweets, again referring to the demand letter, "Schoenberger's outrage at having had his Twitter account data in an academic research paper showing its interactions with QAnon accounts . . . ."

197.    On April 20, 2024, Dilley tweets "cicadas... may become 'flying saltshakers of death,'" claiming to cite the Washington Post, adding hashtag "#Cicada3301" at the close of her post.

198.    On April 21, 2024, Dilley tweets "Here Mr. Thomas Schoenberger appears to be threatening me (left). He leaves off important context (right). I believe evidence clearly shows Mr.

42

Schoenberger to have been a political operative who used the Cicada 3301 puzzle as a tool to socially engineer influencers."

199. Again, on April 21, 2024, Dilley, replying to "EpicJourneyMan1," who falsely said of Thomas and another, "...they both were intimately involved in propagating QAnon...thoughts?" tweets, "Also, I've seen very damning evidence over time consistent with my take."

200. Again, on April 21, 2024, Dilley tweets, "It's my understanding that Thomas told Arturo that QAnon sprang from the Cicada 3301 group... Evidence I've seen is consistent with these assertions."

201. On June 14, 2024, Dilley, sole member and owner of Verbum Vincet LLC, offers Cicada-themed merchandise for sale on an Etsy.com shop.

202. On July 23, 2024, Dilley tweets, "#GameOn #GameOver #ARGmageddon #Cicada3301 #QAnon..." hashtags with TickTock graphics, March 5, 2023. Retweeted July 23, 2024 with text 'War Paint.'"

203. On August 30, 2024, Dilley tweets, "An influential pro-Nazi account persona much studied in my peer-reviewed paper ('QAnon Propaganda on Twitter as Information Warfare: Influencers, Networks and Narratives,' arxiv.org/pdf/2207.05118) is showing on my X feed, despite lack of following or interacting with it. Is Elon tweaking algorithms to spread neo-Nazi content?" Dilley again promotes her paper using a "QAnon, Cicada 3301" graphic.

204. On September 21, 2024, Dilley retweets a post from "Nordstrom," stating falsely, "Arturo is a Psychopathic Narcissist just like Thomas," to which Dilley adds her reply, falsely stating, "Nailed it. 100%."

205. On November 15, 2024, using a variant of Dilley's twitter profile, that is, "@Laura_Greenaura," Dilley tweets, "disinformation/QAnon research" immediately followed by hashtag "#Cicada3301," which she depicts adjacent to the immediately preceding text she posted.

43

206. On December 19, 2024, Dilley tweets the false statement that her former fiancé, Tafoya, had "been getting paid by a certain Thomas S. off and on since at least November, 2023," which is knowingly incorrect innuendo, in addition to her falsely implying with such language that Thomas provided financial assistance for any reason other than as an act of charity to help Tafoya through a time of personal austerity, hardship, and need in which he had been suffering.

207. On January 17, 2025, Dilley falsely tweets, "My 2021 research paper exposed Thomas Schoenberger and his network."

208. On January 20, 2025, Dilley falsely tweets that Trevor Fitzgibbon works "for authoritarians like Putin," and calling Fitzgibbon the "business partner" of Thomas.

209. On January 24, 2025, Dilley falsely tweets, "Looks like extortion, blackmail, bribery, and international conspiracy by Arturo Tafoya Romo 'Lestat' and Thomas Schoenberger." "I mean, it's pretty damn clear - "international" + "conspiracy.""

210. On March 2, 2025, in the context of, and her reference to, Artificial Intelligence-generated classical musical compositions and productions, Dilley, solely to taunt, embarrass, humiliate, demean, and belittle Thomas, "Eat your heart out, 'composer,'" for no legitimate purpose, and simply to lower him in the estimation of others in her audience.

211. Defendants have taken no action to prevent further false accusations against Thomas, whose life remains in danger to this day, because he has been falsely accused of being the founder and driver of QAnon, a domestic terrorist group, himself a domestic terrorist, a cult leader engaging in propaganda and information warfare, and a member of the fascist IAM cult, by Defendants.

R.

212. The crimes of which Defendants blame Thomas, offenses he did not commit, are capital offenses, putting him in jeopardy of vigilante retaliation by proxies of those whom

44

Defendants have incited to probable violence, as well as in danger of arrest, conviction, and punishment up to and including life imprisonment and the death penalty.

213.   Defendants have put his life in danger and have destroyed his ability to earn a living as a composer. As a direct and proximate result of Defendants' unlawful conduct, Thomas is permanently psychologically paralyzed, traumatized, and in profound fear for the safety and well-being of family, friends, and himself, standing publicly blamed by mass electronic communication of causing a shooting on the University campus.

214.   Defendants' plan, artfully executed, was to "cancel" Thomas, permanently.

215.   Sadly, they have succeeded.

## S.

216.   Defendants knowingly created false perceptions of connections and involvement among Twitter accountholders on the one hand and the alleged "QAnon Influencers" on the other hand.

217.   In considering available data kept on Twitter/X accounts, Defendants failed to disclose that individual accounts can be grouped into threads and groupings of an arbitrary number of accounts in protracted conversation (or non-conversation, simply receiving messages on a thread because the account has been "tagged" by others to become associated with that thread, regardless of whether or not the tagged account even notices dialog on that thread), whether the account owner wishes to have his or her name, handle, or other identity source included, or his or her data to be so disclosed and made the subject of unreliable and unproven methods of data analysis and the drawing of expert opinions and conclusions on the basis of such analyses.

218.   In analyzing Twitter interaction data, Defendants knowingly failed to take into account that dialog on a thread could have included short responses such as a laughing emoji to respond to humor, a frowning emoji to express disagreement, and similar indicia, but rather

presumed that all interactions were serious and substantive and merely counted the number of same, without regard to the content or context.

219.    Defendants knowingly employed unsubstantiated allegations made by detractors of Thomas that many Twitter accounts vacuumed up in their data sweep were "bots" or "socks" or were directed by or utilized by Thomas at Thomas's direction, when such was not the case, resulting in appallingly false and misleading conclusions, upon which Defendants rested their entire thesis of the QAnon paper, without actually verifying the identities they imputed to the various accounts.

220.    While the accountholder may "block" others on the thread, "mute" the thread, or leave the thread, Twitter/X API data continues to identify the accounts as participants in the Twitter/X post ("tweet") interactions, making it appear, or giving rise to the false inference, that that person is engaged and involved as an active participant.

221.    Thus, conclusory statements that one accountholder is connected to one or more other accountholders merely by virtue of this untested, unproven, and unreliable data sets, are false, misleading, or very probably false and misleading, at the least (rendering them, in effect, "junk science").

222.    Because the API data continues to identify the accountholder as participants even though they are not, and as there are no controls or safeguards against such false positives, it is difficult if not impossible for the accountholder to overcome such prejudicial and unreliable assumptions by third parties lacking firsthand knowledge of the true extent of the actual interactions or connections between and among accountholders.

223.    No controls have yet been developed to safeguard results or act as a check in any way on the truthfulness, reliability, confirmability, repeatability, or integrity of such results in this area of endeavor. Yet, they are posted and published to the world as gospel.

224.   Such unreliable data collection, compilation, and analysis, in gross, results, or can result, or is likely to result, in false perceptions of involvement, interaction and connection.

225.   Such untested, false and prejudicial perceptions, assumptions, and conclusions can be or are commonly treated as unrebuttable and not subject to refutation. This creation of a false perception of involvement reality makes it difficult if not impossible to circumvent, short of contacting each accountholder and interviewing them as to whether they have disengaged from the thread, that is assuming the accountholder were even give a chance to offer a rebuttal in the first place.

226.   In the present case, upon information and belief, Defendants interviewed only a tiny, negligible, sample set of accountholders whose data they analyzed, if any at all, even though their purported identities were disclosed as part of the methods, analyses, and conclusions in the research papers that Defendants published, modified, re-published, and supplemented in later serial reports of findings and untested hypotheses.

227.   Defendants obtained no reliable verification of the results from the actual accountholders they were judging to order accurately to measure and analyze real human interactions and communications.

228.   Defendants chose not to follow ethical standards, scientific standards, or any other generally accepted technical and professional standards in this novel and utterly untested endeavor of "academic" development or furtherance of knowledge.

229.   The work is rife with ludicrous presumptions on stark speculation, conjecture, and unfounded guesswork, even though this work was done with respect to, and in the epicenter, of a highly-charged arena of partisan – even radical or revolutionary – internet political discourse and high-tech internet methods of attempted persuasion, often if not typically among persons entirely anonymous from one another.

47

230. Defendants chose to take on the perilous subject of QAnon internet propaganda – a veritable hotbed of dissension, cheap talk, among countless, faceless strangers, pretenders, and cowards lacking names and identities, and inanimate supposed actors, in a dark world where bots, not people, are the source of repetitive "hits."

231. This informs Defendants' audiences of nothing meaningful, since nothing may be meaningfully measured, let alone verified. Nothing is gained if one sincerely seeks to learn about actual dialogue between real humans.

T.

232. Defendants, themselves, knowingly chose to enter the treacherous new frontier known as the "Internet Wild Wild West."

233. Defendants embarked on this research effort in a presidential election year.

234. It was precisely *because* it was an election year that they did so. By doing so, they could, in the guise of scholarship, satisfy their true desire – to advance their own brand of partisan political propaganda in a game of supposed ideological heroes and supposed ideological villains.

235. At the same time, they chose to arm themselves with phantasmagorical "connections" and "implications" among *"accounts spreading disinformation"* and nothing more.

236. Defendants offer no evidence, and fail even to cite any evidence, that such alleged "connections" are between or among any "actual human beings."

237. Dilley failed to establish what was actually disinformation versus factual. She labeled words as disinformation based upon her political stance, not upon objective scholarly methodology.

238. Defendants adhered to no objective safeguards or standards to stave off the likelihood of woefully untrue assumptions and conclusions and ensure, or at least minimize, mitigate, or qualify, otherwise woefully untrue findings of fact or opinions sufficiently based in

objective, verifiable facts to avoid fractures in the scientific method in the novel field of "cyber-propaganda," "cyber-religion," or cyber-alternative games, puzzles, and realities.

239. Defendants' lack of adherence to, or observance of, any accepted or established scientific or social science research standards or methods, and apparently in complete disregard of ethical standards, underpins Defendants' scheme of using such biased literature to torment Thomas, even though he has constantly and consistently denied such interactions and communications, and even in the absence of any reliable proof to the contrary.

240. Defendants did, in fact, execute on that scheme by such means, as well as others, to injure Thomas as detailed herein.

U.

241. Thomas had numerous ongoing contracts, projects, and business with third parties, as well as numerous business relationships and expectancies, including but not limited to those with Michael Levine and his business organization, Brett Leonard and his business organizations, and Warren Zide and his business organizations.

242. Many people were interested in the Cicada 3301 puzzles and had a fascination with Cicada 3301, and, in particular, Thomas's music and how Plaintiffs perceived history and God. Dilley was aware of all of these.

243. The remaining Defendants, likewise, knew or should have known of them, as well.

244. Plaintiffs' interests in the contracts and their expectancies were shattered by Defendants' malicious campaign to discredit, defame, and destroy them.

246. As detailed above, Defendants undertook that campaign, practiced it repeatedly over the course of time, compounded it more deeply over time, and inflicted first injuries, only to exacerbate them repeatedly over time.

49

247.    Defendants knowingly instigated the breaches and terminations of the contracts, and they knowingly interfered with Plaintiffs' relationships, opportunities, and expectancies so as to frustrate and eliminate, permanently, those relationships and expectancies of Plaintiffs. Thomas faces increased harassment in social media and via other means of electronic communications. Thomas has received threats of violence, and, in addition to suffering unimaginable, devastating, mental strain, he has lost friends, business associates, and potential friends and business associates in addition to Messrs. Levine, Leonard, Zide, and their business organizations and ventures.

248.    The contract rights, benefits and the business relationships and expectancies Thomas enjoyed have been forever irretrievably lost, and the damage to these relationships and expectancies is irreversible. Thomas has been advised by an unbiased third party knowledgeable on the subject that the actions of Defendants detailed herein have killed the fruitful opportunities for success as a composer in film and television and likely otherwise.

249.    By way of illustration, only, and not limitation, at the pertinent time, Thomas was on the verge of getting rights and participation in a television show based on his creative product and skills that promised to be a lucrative deal for him and Cicada 3301; that advantage, among numerous others, has been lost as a direct and proximate result of Defendants' malfeasance and lawlessness as detailed herein.

250.    Plaintiffs have lost film deals, television deals, and, by way of further illustration, a six-part docuseries, a book deal, pending and future music deals, a deal for the co-development of games, as well as pending music deals, and a movie studio deal because Defendants knowingly snuffed them.

251.    Defendants further knowingly snuffed two pending game show deals Thomas and Cicada 3301 had, including the creation of a game show around Cicada 3301 using Plaintiffs' philosophies and knowledge of arcane history. Additionally, Plaintiffs lost a deal to create a reality

television series along similar lines and themes. Plaintiffs lost these deals because Defendants knowingly snuffed them.

V.

252. Defendants have caused Thomas to live in constant turmoil from Defendants' malicious communications, which include but are not limited to Twitter, its successor, X, blog sites, news articles, old and new forms of media, in private messages, on servers and platforms, including servers Defendants hosted for groups of computer internet hackers, media representatives, compensated trolls, all research team members, as well as Dilley and her other enlistees, confidants, cohorts, vigilante recruits, as well as her associations, contacts, and friends in higher education circles and academia, as mercenaries to act at Defendants' behest, and any other person or source available to, or susceptible to the overtures of, Defendants, to spread further their own, evil "narrative" for woeful, partisan political gain.

253. Dilley has used, continues to use, and threatens imminently to use in the future her associates, professional clout, former or current position or affiliation with the University, her notoriety and own reputation, and associations in higher education circles to assist her in this scheme or as direct or indirect participants in this scheme.

254. Dilley has done so and continues to do so, giving these trolls, enlistees, and other collaborators further opportunities and platforms from which to harm and defame Thomas, in furtherance of their own political agendas.

W.

255. As demonstrated in detail herein, Dilley has admitted, repeatedly, as to her work on QAnon propaganda, in which she scandalously, maliciously, and falsely accuses Thomas of being the key "influencer" and propagator of such propaganda, she considers herself a partisan political

51

and ideological activist with a propensity toward using sensationalism and scandal-mongering, that is, yellow journalism, to curb or stop the alleged QAnon propaganda.

256.    Dilley has repeatedly admitted that such field of research and endeavor is well beyond the limits of her expertise as an Associate Professor of Psycholinguistics of the University. However, she further readily and repeatedly admits that, in this regard, she considers herself more as a journalist and firebrand than an academician.

257.    She even took the position in her telephone conference with Bogaerts that she is a "journalist," and that, as a journalist, she believed she may be shielded from liability for what she publishes under supposed privileges, immunities, and doctrines that afford her protections as a journalist under law. That assumption is unfounded and incompetent. Defendants do not enjoy, and are not entitled to, such legal immunities and protections for any of their unlawful and unconstitutional acts and omissions stated herein.

258.    At the same time Dilley has admitted that she even considers herself woefully unqualified to engage in scholarship in the realm of political advocacy, which reaches far beyond her alleged expertise in the separate, distinct, and essentially unrelated field of psycholinguistics.

259.    Because Michigan State University is a public university and an arm of the State of Michigan, Defendants may not publish works or otherwise commit acts that diminish the rights of Plaintiffs and of all other members of the public to privacy, freedom of expression, freedom of religion and worship, and freedom from governmental harassment and discrimination on the basis of political viewpoint, religion and race, all directly violative of the rights of Plaintiffs and other members of the public under the Michigan and United States constitutions.

260.    The medium through which the State of Michigan engages in such wicked practice is the once venerable College of Communication Arts and Sciences of Michigan State University. Dilley's yellow journalism has been practiced by her with the express, advance knowledge and

imprimatur of her superiors, department heads, Dean of the College, the University president, and the Trustees.

261. The State may not engage in such yellow journalism, nor may it propagate polemic, under the guise of university scholarship when that very scholarship subordinates the public good to private advocacy.

262. Yet, the State proselytizes and imposes on the People its chosen religion. And so does it inflict on the People, in the guise of university scholarship, ideological dogma. It does so, unabashedly, all in the very name the State.

263. That is, beyond question, inimical to the fundamental and natural, unalienable, freedoms, liberties, and rights of the People. Yet that is what the State is doing and has been doing through its arm, the Michigan State University College of Communication Arts and Sciences.

264. No arm or agent of the State may do so without violating the constitutions of the State of Michigan and of the United States.

265. Since the founding of our nation, the People have held it beyond question that no state may offend the supreme law of the land found in the United States constitution. The State of Michigan cannot usurp for itself such power. To allow as much would be tantamount to allowing the State, acting alone and unbridled, unilaterally and autocratically to amend its own the constitution, which power is reserved to the People and the People, alone.

266. The State is vested with awesome power, but it may not assert its power to the violence of the rights and liberties guaranteed to the People under the federal and state constitutions.

267. Because Defendants have failed and refused to honor Thomas's demands to rectify their wrongdoing, it has become necessary for Thomas to bring this action.

53

Court One
*Ultra Vires*

268.    Plaintiffs incorporate by reference as though fully set forth herein all averments above.

269.    "All political power is inherent in the people. Government is instituted for their equal benefit, security, and protection." CONST 1963, art I, § 1

270.    The Trustees, as a body corporate, is an arm of the State of Michigan.

271.    The Trustees, when acting in service of the public trust in accordance with, within the scope of the constitutional and statutory authority granted to it, and when performing honestly and faithfully in service to the People, act *intra vires*, engage lawfully in the providing of public education, and in so doing are engaged in the exercise or discharge of a governmental function.

272.    When acting outside of, and beyond, the scope of authority granted to them, their acts are *ultra vires*, and do not act for the equal benefit, security, and protection of the People.

273.    In acting *ultra vires*, they do not engage in the proper providing of public education, and in so doing and to the extent of the *ultra vires* acts they are not engaged in the exercise or discharge of a governmental function.

274.    As detailed above, the Trustees have acted and are acting *ultra vires* because they have acted and are acting outside of, and beyond, the scope of authority granted to them under the constitution and laws of the State of Michigan, and because they have acted and are acting in knowing violation of the rights of Plaintiffs and the People arising under the constitution of the State of Michigan, the constitution of the United States, and the laws of the State of Michigan, and they have acted and are acting against the equal benefit, security, and protection of the People to the extent of their *ultra vires* acts and omissions detailed above. Thus, they have not been and are not engaged in the exercise or discharge of a governmental function as, and to the extent of, their acts and omissions detailed herein.

54

275. As detailed above, the Trustees have acted, and continue to act, in violation of the rights of Plaintiffs and the People to the equal protection of the laws, in denial of the full enjoyment of their civil and political rights, and the Trustees have acted and continue to act to discriminate against Plaintiffs because of religion and race, contrary to the constitutions of the State of Michigan and of the United States. CONST 1963, art I, § 2; US Const, Am I;  US Const, Am XIV.

276. As detailed above, the Trustees have acted, and continue to act, in violation of the rights and liberty of the People and of Plaintiffs to worship God according to the dictates of their own conscience, and the Trustees have acted, and continue to act, in diminishment of the civil and political rights, privileges and capacities on account of their religious belief, contrary to the constitutions of the State of Michigan and of the United States. CONST 1963, art I, § 4; US Const, Am I;  US Const, Am XIV.

277. As detailed above, the Trustees have acted, and continue to act, in violation of the rights and liberty of the People and of Plaintiffs to be free from restraint or abridgment of the liberty of speech, contrary to the constitutions of the State of Michigan and of the United States. CONST 1963, art I, § 5; US Const, Am I;  US Const, Am XIV.

278. As detailed above, the Trustees have acted, and continue to act, in violation of the rights and liberty of the People and of Plaintiffs in their privacy and to be secure from unreasonable searches and seizures, contrary to the constitutions of the State of Michigan and of the United States. CONST 1963, art I, § 11; US Const, Am I;  US Const, Am IV; US Const, Am XIV.

279. As detailed above, the Trustees have acted, and continue to act, in violation of the rights and liberty of the People and of Plaintiffs to due process of law, contrary to the constitutions of the State of Michigan and of the United States. CONST 1963, art I, § 17; US Const, Am XIV.

280. As detailed above, the Trustees have not acted, and are not acting, within the scope of their authority, as to, and to the extent of, their acts and omissions detailed herein.

281.    As detailed above, the Trustees did not and do not reasonably believe they have acted, and are acting,  within the scope of their authority, as to, and to the extent of, their acts and omissions detailed herein.

282.    As detailed herein, government actor Defendant Dilley and the remaining government actors named  herein, whether or not named as parties-Defendant in this action, have acted and are acting *ultra vires*, as to, and to the extent of, their acts and omissions detailed herein.

283.    As detailed herein, government actor Defendant Dilley and the remaining government actors named  herein, whether or not named as parties-Defendant in this action, have acted and are acting *ultra vires* because they have acted and are acting outside of, and beyond, the scope of authority granted to them under the constitution and laws of the State of Michigan, and because they have acted and are acting in knowing violation of the rights of Plaintiffs and the People arising under the constitution of the State of Michigan, the constitution of the United States, and the laws of the State of Michigan, and they have acted and are acting against the equal benefit, security, and protection of the People to the extent of their *ultra vires* acts and omissions detailed above. Thus, they have not been and are not engaged in the exercise or discharge of a governmental function as, and to the extent of, their acts and omissions detailed herein.

284.    As detailed above, government actor Defendant Dilley and the remaining government actors named  herein, whether or not named as parties-Defendant in this action, have acted and are acting *ultra vires* because they have acted and are acting in knowing violation of the rights of Plaintiffs and the People arising under the constitution of the State of Michigan, the constitution of the United States, and the laws of the State of Michigan, and they have acted and are acting against the equal benefit, security, and protection of the People to the extent of their *ultra vires* acts and omissions detailed above, contrary to CONST 1963, art I, §§ 2, 4, 5, 11, and 17; US Const, Am I, IV, and XIV. Thus, they have not been and are not engaged in the exercise or

56

discharge of a governmental function as, and to the extent of, their acts and omissions detailed herein.

285.   As detailed above, government actor Defendant Dilley and the remaining government actors named  herein, whether or not named as parties-Defendant in this action, have not acted, and are not acting, within the scope of their authority, and are thus have acted and are acting *ultra vires* as to, and to the extent of, their acts and omissions detailed herein.

286.   As detailed above, government actor Defendant Dilley and the remaining government actors named  herein, whether or not named as parties-Defendant in this action, did not and do not reasonably believe they have acted, and are acting within the scope of their authority, as to, and to the extent of, their acts and omissions detailed herein.

287.   As detailed herein, Plaintiffs suffered and continue to suffer injuries as a direct and proximate result of intentional and other torts Defendant have committed and continue to commit against them, to the great past and continuing economic and non-economic injuries of Plaintiffs, as detailed herein, and for which Defendants are fully accountable and liable to Plaintiffs for damages, attorney fees, and other relief.

288.   As detailed herein, the torts Defendants have committed and are committing against, and causing injuries to Plaintiffs in their persons and damages to Plaintiffs in their property as detailed herein, were not committed and caused by Defendants while acting in the course of employment, and they were not committed and caused by Defendants while acting on behalf of a governmental agency, as such acts and omissions were committed and continue to be committed against Defendant *ultra vires*, as detailed herein.

289.   As detailed herein, the torts Defendants have committed and are committing against Plaintiffs to the injury of Plaintiffs in their persons and to the damage of Plaintiffs in their property, such injuries and damages being the direct and proximate result of Defendants' commission of

57

such torts against Plaintiffs, are intentional torts under the law of intentional as it existed before July 7, 1986 and as it exists today.

290. Defendants, because of their *ultra vires* acts and omissions, as detailed herein: a) enjoy no tort immunity or immunity from tort liability under law because of, as to, and to the extent of, their *ultra vires* and unconstitutional acts and omissions as detailed herein; b) enjoy no immunity from suit under law because of, as to, and to the extent of, their *ultra vires* and unconstitutional acts and omissions as detailed herein; and c) enjoy no immunity from tort liability for the injuries they have caused and are continuing to cause Plaintiffs as detailed herein.

291. Defendants do not enjoy immunity from suit or immunity from tort liability for their acts and omissions detailed herein because the torts Defendants have committed and are committing against Plaintiffs were and are intentional torts.

292. Defendants do not enjoy immunity from suit or immunity from tort liability for their conduct, acts, and omissions detailed herein, because their conduct in committing torts against Plaintiffs as detailed herein constitutes past and continuing conduct so reckless as to demonstrate a substantial lack of concern for whether an injury to Plaintiffs resulted or results.

293. Defendants' conduct as detailed herein in committing torts against Plaintiffs to the injury of Plaintiffs in their persons and damages to Plaintiffs in their property as detailed herein amounts to gross negligence that is the proximate cause of the injury and damage.

294. The acts and omissions of Defendants detailed herein violate governing documents of the University, including but not limited to the bylaws, ordinances, policies, regulations, policy manual, faculty handbooks, other handbooks, anti-discrimination policy, and anti-discrimination user's manual, and other manuals, and, specifically, University Policies, MSU Anti-Discrimination Policy, which prohibits unlawful acts of discrimination or harassment, and discrimination and harassment on the basis of political persuasion, religion, and race.

58

295.    The University's Anti-Discrimination Policy User's Manual defines, at p 9, "political persuasion" as "an individual's political beliefs, party affiliation (or non-affiliation), or civic activities." As demonstrated in detail above, Defendants have violated and continue to violate Thomas's constitutional rights to express his views on all subjects. As further demonstrated herein, Defendants' acts in violation of these constitutional rights of Plaintiffs as detailed herein also are acts in violation of the University's Anti-Discrimination Policy as it relates to political persuasion.

296.    The University's Anti-Discrimination Policy User's Manual defines, at p 9, "religion" as:

> Sincerely held religious, ethical, or moral beliefs and related practices including commemoration or observance. This includes those identified with traditional organized religions as well as religious beliefs that are new, uncommon, not part of a formal church or sect, or only held by a small number of people. . . .

297.    As demonstrated in detail above, Defendants have violated and continue to violate Thomas's constitutional rights to worship God according to the dictates of his own conscience, and Defendants have acted, and continue to act, in diminishment of the civil and political rights, privileges and capacities on account of Thomas's religious belief, contrary to the constitutions of the State of Michigan and of the United States.

298.    As further demonstrated above, Defendants have acted, and continue to act, in violation of the rights of Plaintiffs to the equal protection of the laws, in denial of the full enjoyment of their civil and political rights, and Defendants have acted and continue to act to discriminate against Plaintiffs because of religion and race, contrary to the Michigan and United States constitutions. Just as Defendants have violated and are violating Plaintiffs' constitutional rights not to be harassed or discriminated against, or otherwise have their freedoms, rights, and liberties diminished on the basis of religion and race.

299.    The State of Michigan engages in yellow journalism, as Dilley's own words and deeds establish. As demonstrated in detail herein, Dilley has admitted, repeatedly, as to her work

on QAnon propaganda, in which she scandalously, maliciously, and falsely accuses Thomas of being the key "influencer" and propagator of such propaganda, she considers herself a partisan political and ideological activist with a propensity toward using sensationalism and scandal-mongering, that is, yellow journalism, to curb or stop the alleged QAnon propaganda.

300. Dilley has repeatedly admitted that such field of research and endeavor is well beyond the limits of her expertise as an Associate Professor of Psycholinguistics of the University. However, she further readily and repeatedly admits that, in this regard, she considers herself more as a journalist and firebrand than an academician.

301. She even took the position in her telephone conference with Bogaerts that she is a "journalist," and that, as a journalist, she believes herself shielded against legal liability for what she publishes privileges and doctrines that afford her protections as a journalist under law, though she is woefully incorrect in arriving at that legal opinion, as neither she, nor the other Defendants, enjoys and is entitled to such legal immunities.

302. At the same time Dilley has admitted that she even considers herself woefully unqualified to engage in scholarship in the realm of political advocacy, which reaches far beyond her alleged expertise in the separate, distinct, and essentially unrelated field of psycholinguistics.

303. Because Michigan State University is a public university and an arm of the State of Michigan, Defendants may not publish works or otherwise commit acts that diminish the rights of Plaintiffs and of all other members of the public to privacy, freedom of expression, freedom of religion and worship, and freedom from governmental harassment and discrimination on the basis of political viewpoint, religion and race, all directly violative of the rights of Plaintiffs and other members of the public under the Michigan and United States constitutions.

304. The medium through which the State of Michigan engages in such wicked practice is the once venerable College of Communication Arts and Sciences of Michigan State University.

60

Dilley's yellow journalism has been practiced by her with the express, advance knowledge and imprimatur of her superiors, department heads, Dean of the College, the University president, and the Trustees.

305.    The State may not engage in such yellow journalism, nor may it propagate polemic, under the guise of university scholarship when that very scholarship subordinates the public good to private advocacy.

306.    Yet, the State proselytizes and imposes on the People its chosen religion. And so does it inflict on the People, in the guise of university scholarship, ideological dogma. It does so, unabashedly, all in the very name the State.

307.    That is, beyond question, inimical to the fundamental and natural, unalienable, freedoms, liberties, and rights of the People. Yet that is what the State is doing and has been doing through its arm, the Michigan State University College of Communication Arts and Sciences.

308.    No arm or agent of the State may do so without violating the constitutions of the State of Michigan and of the United States.

309.    Since the founding of our nation, the People have held it beyond question that no state may offend the supreme law of the land found in the United States constitution. The State of Michigan cannot usurp for itself such power. To allow as much would be tantamount to allowing the State, acting alone and unbridled, unilaterally and autocratically to amend its own the constitution, which power is reserved to the People and the People, alone.

310.    The State is vested with awesome power, but it may not assert its power to the violence of the rights and liberties guaranteed to the People under the federal and state constitutions.

311.    Article III of the University's Faculty Handbook provides, in part:

Teachers are entitled to full freedom in research and in the publication of the results, subject to the adequate performance of their other academic duties; but

61

research for pecuniary return should be based upon an understanding with the authorities of the institution.

312. Article III is unconstitutional on its face, as it purports to grant to members of the University faculty absolute, unrestricted, power and freedom in the publication of the results of the work of University faculty in the name of academic freedom.

313. Because under the constitutions of the State of Michigan and the United States and other governing state and federal law freedom of speech is not absolute and is subject to restrictions and limitations, Article III on its face runs afoul of those limitations in granting University faculty members unmitigated power, including the power to defame any person.

314. Further, as the State of Michigan is itself prohibited from violating First Amendment guarantees of the free exercise of religion and from engaging in state-imposed partisan political ideology, polemic, and dogma, to name just two examples, the Trustees, as a body corporate and arm of the State of Michigan, and Dilley, as an agent of that body corporate, in turn, are and must be adjudicated so prohibited.

315. Article III, on its face, imposes no such restrictions and qualifications on the "full freedom" of University faculty to publish that the text of that enactment grants. Thus, Article III is unconstitutional on its face.

316. Alternatively, to the extent that Article III may be construed and implemented by Defendants to permit the lawlessness practiced to the injury of the fundamental rights of Plaintiffs as demonstrated in detail herein, then Article III is unconstitutional as applied and must be so adjudicated.

317. To the extent Defendants may rely on other of the University's own governing documents to justify such unconstitutional conduct, those legislative enactments, to the extent they apply to permit the conduct Defendants have practiced against Plaintiffs and other members of the public as detailed herein, such legislation is unconstitutional on its face.

62

318.    To the extent the University interprets and applies its own enactments to justify its deprivations of Plaintiffs' fundamental, vested, and unalienable rights, then those enactments must be adjudged unconstitutional as applied.

319.    Defendants have, thus, breached and are continuing to breach their several constitutional and legal duties owing to Plaintiffs.

320.    As a direct and proximate result of such breaches, Plaintiffs have suffered and are continuing to suffer grave economic and non-economic injuries and damages.

321.    Further, as Plaintiffs have presented a case of actual controversy within the jurisdiction of this Honorable Court in which this Honorable Court must or should declare the respective rights and other legal relations between the parties, and as immediate, preliminary, and permanent injunctive relief is warranted, Plaintiffs are entitled to a declaratory judgment, injunctive relief, and other equitable relief.

322.    Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual and exemplary damages in the full to which Plaintiffs are entitled, and Plaintiffs further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

Count Two

Violations of the Elliott-Larsen civil rights act,
the Michigan constitution, and the U.S. constitution

323.    Plaintiffs incorporate by reference as though fully set forth herein all averments above.

324.    Defendants are subject to the Elliott-Larsen civil rights act, Michigan Public Acts,

63

1976, No. 453, being MCL §§ 37.2101, *et seq.* ("Act"), and all actions, rights, judgments, and other remedies available to Plaintiffs for the past, continuing, and future violations of their rights under the Act.

325. Under the Act, including but not limited to Sections 103(g)-(j), 401, and 402(a), (d) & (e), Defendants have and at all times pertinent hereto have had a duty not to burden Plaintiffs on the basis of religion, race, color, national origin, and expression.

326. As detailed herein, such acts and omissions include, but are not limited to, acts and omissions in violation of Defendants' duties under the Act not to burden the rights of Plaintiffs, including but not limited to "[d]iscriminat[ing] against [Defendants] in the full utilization of or benefit from the [educational] institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, sex, sexual orientation, or gender identity or expression." Section 402(a).

327. As detailed herein, Defendants did commit, have committed, are committing, and threaten imminently to commit, acts and omissions in violations of such duties under the Act not to burden the rights of Plaintiffs, including but not limited to "[p]rint[ing] or publish[ing] or caus[ing] to be printed or published a catalog, notice, or advertisement indicating a preference, limitation, specification, or discrimination based on the religion, race, color, national origin, sex, sexual orientation, or gender identity or expression, of an applicant for admission to the educational institution." Section 402(d).

328. Further, as detailed herein, Defendants did commit, have committed, are committing, and threaten imminently to commit, acts and omissions in violations of such duties under the Act not to burden the rights of Plaintiffs, including but not limited to "[a]nnounc[ing] or follow[ing] a policy of denial or limitation through a quota or otherwise of educational opportunities of a group or its members because of religion, race, color, national origin, sex, sexual

orientation, or gender identity or expression." Section 402(e).

329. Further, as detailed herein, Defendants did commit, have committed, are committing, and threaten imminently to commit, acts and omissions in violations of duties under the constitutions of Michigan and of the United States as detailed herein, including but not limited to their having committed, continuing to commit, and threatening imminently to commit acts and omissions in violation of the Act and other governing law, including but not limited to the violation, impingement, and burdening of their rights under the constitutions of Michigan and of the United States.

330. Defendants have committing, are committing, and threaten imminently to commit such violations of the Act and of the constitutions of Michigan and of the United States acting individually, collectively, jointly and severally, and by one or more combinations of two or more of Defendants acting in active concert with one another with knowledge of the unconstitutional, unlawful, and wrongful acts and omissions as detailed herein, and they have conspired, are continuing to conspire, and threaten imminently to conspire together in one or more combinations of two or more of Defendants acting in active concert with one another with knowledge of the unconstitutional, unlawful, and wrongful acts and omissions as detailed herein.

331. Such rights of Plaintiffs that Defendants have violated, are continuing to violate, and threaten imminently to violate, include but are not limited to their rights to: the freedoms of worship, religious beliefs, the practice of religion, speech, expression, thought, and association as detailed herein; they further include but are not limited to the violations of the rights of Plaintiffs to equal protection of the laws and to privacy as detailed herein.

332. As a direct and proximate result of such statutory, constitutional, and other violations of Plaintiffs' rights, Plaintiffs have suffered and are continuing to suffer grave economic and non-economic injuries and damages.

65

333. Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual and exemplary damages in the full to which Plaintiffs are entitled, and Plaintiffs further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

Count Three
42 U.S.C. § 1983

334. Plaintiffs incorporate by reference as though fully set forth herein all averments above.

335. Defendants have acted and are acting within the scope of their office, employment, and under color of state law.

336. Defendants, acting within the scope of their office, employment, and under color of state law, have subjected and are subjecting, and have caused to subject and are causing to be subjected, Plaintiffs within the jurisdiction of the State of Michigan to the deprivation of rights, privileges, and immunities secured by the constitution of the United States contrary to 42 U.S.C. § 1983.

337. Consequently, Defendants are liable to Plaintiffs at law and in equity for redress.

338. Rights, privileges, and immunities of which Defendants have been and are depriving Plaintiffs, include their rights to freedom of speech, to the free exercise of religion, to privacy and to be free from unreasonable searches and seizers, to the equal protection of the laws, and to due process of law.

339. Defendants have created laws, policies, practices, and customs by and under which they have effected such constitutional deprivations, as detailed herein.

66

340.   Defendants have further established a de facto policy of deliberate indifference to Plaintiffs and to the rights of Plaintiffs, as detailed herein.

341.   Defendants have further established a policy, pattern of practice, and custom allowing for the unlawful hiring, retention, failure to supervise, and failure to train University employees, including members of the University faculty, such as, and including, Dilley, in violation of their duties owing to Plaintiffs, as detailed herein.

342.   Defendants have further established a policy, pattern of practice, and custom of concealing and failing to disclose though obligated by law to do so, information and evidence of wrongdoing. Defendants, acting pursuant to and consistent with such policy, pattern, and practice of concealment, did conceal, have concealed, and continue to conceal material of evidence in the present case of or concerning Dilley, other employees of the University, and Plaintiffs, in violation of their duties owing to Plaintiffs as detailed herein.

343.   As a direct and proximate result of Defendants' laws, policies, customs and practices and in violation of their duties owing to Plaintiffs, Plaintiffs have been deprived of their constitutionally protected rights and have been injured in their persons, liberty, and property, as detailed herein, and Plaintiffs continue to be so deprived and so injured.

344.   Further, as Plaintiffs have presented a case of actual controversy within the jurisdiction of this Honorable Court in which this Honorable Court must or should declare the respective rights and other legal relations between the parties, and as immediate, preliminary, and permanent injunctive relief is warranted, Plaintiffs are entitled to a declaratory judgment, injunctive relief, and other equitable relief.

345.   Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

67

Therefore, Plaintiffs demand judgment against Defendants for actual, exemplary, and punitive damages in the full to which Plaintiffs are entitled, and Plaintiffs further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

Count Four
42 U.S.C. § 1985

346.    Plaintiffs incorporate by reference as though fully set forth herein all averments above.

347.    Defendants have conspired and have acted in active concert together with those having knowledge of the unconstitutional conduct, including but not limited to those persons identified above, against and to the deprivation of rights of, and injury to, Plaintiffs directly or indirectly, including the deprivation of Plaintiffs of their right to equal protection of the laws, equal privileges and immunities under the laws, and for the purpose, and with the intent, and effect, of preventing or hindering the constituted authorities of the State of Michigan from giving or securing to all persons within the State of Michigan the equal protection of the laws, as detailed herein, contrary to 42 U.S.C. § 1985.

348.    Defendants continue to conspire and act in active concert with such persons above specified to deprive Plaintiffs of their right to equal protection of the laws and for the purpose, and with the intent, and effect, of preventing or hindering the constituted authorities of the State of Michigan from giving or securing to all persons within the State of Michigan the equal protection of the laws, as detailed herein, contrary to 42 U.S.C. § 1985.

349.    Consequently, Defendants are liable to Plaintiffs at law and in equity for redress.

350.    As a direct and proximate result of Defendants' deprivations of Plaintiffs of such rights and other lawlessness and unlawful conduct of Defendants, and otherwise in violation of their duties owing to Plaintiffs, Plaintiffs have been deprived of their constitutionally protected

68

rights and have been injured in their persons, liberty, and property, as detailed herein, and Plaintiffs continue to be so deprived and so injured.

351. Further, as Plaintiffs have presented a case of actual controversy within the jurisdiction of this Honorable Court in which this Honorable Court must or should declare the respective rights and other legal relations between the parties, and as immediate, preliminary, and permanent injunctive relief is warranted, Plaintiffs are entitled to a declaratory judgment, injunctive relief, and other equitable relief.

352. Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual, exemplary, and punitive damages in the full to which Plaintiffs are entitled, and Plaintiffs further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

## Count Five
## 42 U.S.C. § 1986

353. Plaintiffs incorporate by reference as though fully set forth herein all averments above.

354. Defendants had knowledge and have knowledge that the wrongs conspired to be done, were about to be done, and are about to be done, against Plaintiffs, as detailed in Count Three, above, and as otherwise detailed herein, to wit: to interfere with and deprive Plaintiffs and others of their rights to equal protection of the laws.

355. Defendants had power to prevent or aid in preventing the commission of the same, and they neglected and refused so to do, contrary to 42 U.S.C. § 1986, and such wrongful acts were, in fact, committed against Plaintiffs, as detailed herein.

69

356.    As a direct and proximate result of Defendants' failure and refusal to exercise their power to prevent or aid in the prevention of same, Plaintiffs have been deprived of their constitutionally protected rights and have been injured in their persons, liberty, and property, as detailed herein, and Plaintiffs continue to be so deprived and so injured.

357.    Consequently, Defendants are liable to Plaintiffs at law and in equity for redress.

358.    Further, as Plaintiffs have presented a case of actual controversy within the jurisdiction of this Honorable Court in which this Honorable Court must or should declare the respective rights and other legal relations between the parties, and as immediate, preliminary, and permanent injunctive relief is warranted, Plaintiffs are entitled to a declaratory judgment, injunctive relief, and other equitable relief.

359.    Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual, exemplary, and punitive damages in the full to which Plaintiffs are entitled, and Plaintiffs further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

## Count Six
### Concert of Action and Civil Conspiracy

360.    Plaintiffs incorporate by reference as though fully set forth herein all averments above.

361.    Defendants acted tortiously and in active concert with each other and with persons not named as parties in this action but co-conspirators with Defendants, with such persons having knowledge of the improper and wrongful conduct, pursuant to a common design, including the commission of a conspiracy to injure and destroy Thomas, personally, by causing him mental and

70

physical pain and suffering as well as severe emotional distress, and also in his business, and in his property, and to inflict economic injury on and destroy the Company, including but not limited to Defendants' hatching and carrying out against Plaintiffs their vicious, malicious, and wicked campaign to discredit Plaintiffs as detailed above, as well as all other tortious, wrongful, illegal, and unconstitutional acts including but not limited to the conspiracy to violate, diminish, and destroy Plaintiffs' enjoyment of civil and constitutional rights and all other wrongful acts including those detailed herein.

362. Defendants combined to accomplish, by concerted action, a wrongful or unlawful purpose by lawful means, a lawful purpose by wrongful or unlawful means, or a wrongful or unlawful purpose by wrongful or unlawful means, to wit, the discrediting and maligning of Plaintiffs, by all means detailed above, among other things.

363. At all times pertinent to this action, Defendants engaged in the concerted activities against Plaintiffs as detailed above by express or implied agreement. Plaintiffs may have difficulty specifically identifying all the activities of Defendants and their co-conspirators due to the generic similarities of such activities as engaged in and promoted by Defendants, as detailed above.

364. Due to the concert of action among Defendants, each is liable to Plaintiffs for the injuries and damages detailed above, even if there was no direct relation to the conduct of one Defendant or co-conspirator.

365. Defendants are jointly, severally, and alternatively liable to Plaintiff for all injuries and damages detailed above.

366. Defendants illegally, maliciously, and wrongfully conspired with each other with the intent and for the illegal purpose of discrediting, intimidating, threatening, and inflicting emotional distress on Plaintiffs, and Defendants did, in fact, discredit, intimidate, threaten, and inflict emotional distress on Plaintiffs.

71

367. Defendants, in combination, conspired to commit such wrongful acts against Plaintiffs and did, in fact, commit such acts and did, in fact, realize the resultant accomplishment of their wrongful and unlawful purpose or purposes as detailed above.

368. This conspiracy resulted in the illegal, unlawful, or tortious activity of committing the tortious acts described herein, including but not limited to stalking and harassment (including cyberstalking and cyberharassment), and interference with business relationships and advantageous business expectancies, hacking into Plaintiffs' electronic data and electronically-stored records, information, and communications, and the infliction of emotional distress upon, Plaintiffs.

369. As a direct and proximate result of Defendants' conduct, including Defendants' engaging in concert of action and civil conspiracy as detailed above, Plaintiffs have been injured and damaged as detailed herein.

370. As a direct and proximate result of Defendants' conduct, including Defendants' engaging in concert of action and civil conspiracy as detailed above, Plaintiffs have suffered injury and damage, including mental pain and suffering, emotional distress, mortification, embarrassment, humiliation, and all other economic and non-economic injuries detailed above.

371. Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual, exemplary, and punitive damages in the full to which Plaintiffs are entitled, and Plaintiffs further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

72

Count Seven
Tortious Interference With Business Relations

372.     Plaintiffs incorporate by reference as though fully set forth herein all averments above.

373.     Plaintiffs had numerous ongoing contracts, projects, and business with third parties, as well as numerous business relationships and expectancies with third parties, including but not limited to those with Michael Levine and his business organization, Brett Leonard and his business organizations, and Warren Zide and his business organizations.

374.     Many people were interested in the Cicada 3301 puzzles and had a fascination with Cicada 3301, and, in particular, Thomas's music and how Plaintiffs perceived history and God.

375.     Defendants were aware of all these existing business relations and expectancies of Plaintiffs.

376.     Plaintiffs' interests in the contracts and their expectancies were shattered by Defendants' intentional interference with the contracts, which resulted in the breaches of those contracts, and Defendants intentionally, knowingly, and maliciously instigated the breaches, which instigation was unjustified.

377.     They did so by wrongful conduct detailed herein, including but not limited to their planning and carrying their malicious campaign to discredit, defame, and destroy Plaintiffs, their rights and advantages in such contracts, and the advantageous contractual relations Plaintiffs enjoyed with these persons and entities.

378.     As detailed above, Defendants undertook that campaign, practiced it repeatedly over the course of time, compounded it more deeply over time, and inflicted first injuries, only to exacerbate them repeatedly over time.

73

379.   Defendants knowingly instigated the breaches and terminations of the contracts, and they knowingly interfered with Plaintiffs' relationships, opportunities, and expectancies so as to frustrate and eliminate, permanently, those relationships and expectancies of Plaintiffs.

380.   Defendants further intentionally and wickedly interfered with Plaintiffs' valid business relations and expectancies. They did so and continue to do so by illegal, unethical, and wrongful acts that breached or terminated such relationships and expectancies that Plaintiffs had, enjoyed, and were actively working further to establish and develop.

381.   Defendants did so by the intentional doing of per se wrongful acts and by the doing of lawful acts with malice and unjustified in law for the purpose of invading the contractual rights, valid and established business expectancies, and advantageous business opportunities, as detailed herein.

382.   As a direct and proximate result of Defendants' wrongful and malicious conduct, Plaintiffs have suffered and continue to suffer injuries and damages.

383.   The contract rights, benefits and the business relationships and expectancies Plaintiffs enjoyed have been forever irretrievably lost, and the damage to these relationships and expectancies is irreversible, as detailed herein.

384.   Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual, consequential, and exemplary damages in the full to which Plaintiffs are entitled, and Plaintiffs further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

## Count Eight
## Stalking

385.    Plaintiffs incorporate by reference as though fully set forth herein all averments above.

386.    As detailed herein, Defendants have engaged and are continuing to engage in a willful course of conduct against Thomas, rendering him the victim of repeated and continuous harassment such that he actually was, and any reasonable person would, likewise, have been, caused to feel tormented, terrorized, harassed, and molested.

387.    Thomas still has substantial cause to feel, and continues to feel, tormented, terrorized, harassed, and molested, as detailed herein.

388.    As detailed above, the harassing conduct of Defendants toward Thomas has included and includes, but is not limited to, repeated and continuing unconsented contact that would cause a reasonable individual to suffer emotional distress, and that harassing conduct did, in fact, actually cause Thomas to suffer emotional distress.

389.    As detailed above, Defendants committed two or more acts of unconsented contact of Thomas that did, in fact, actually cause emotional distress to Thomas and would also have caused a reasonable person such distress.

390.    Such unlawful and wrongful intentional and malicious conduct by Defendants constitutes actionable civil stalking against Thomas for which he is entitled to full redress. MCL 600.2954; 750.411h.

391.    As detailed above, the acts of stalking occurred in Michigan and Utah.

392.    As a direct and proximate result of Defendants' unlawful stalking of Thomas, he has suffered damages and other severe non-economic, and well as economic, injuries, including emotional distress and trauma, as well as physical and other sickness and injuries, as detailed above.

393. Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual, consequential, and exemplary damages in the full to which Plaintiffs are entitled, and Plaintiffs further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

## Count Nine
### Intentional Infliction of Emotional Distress

394. Plaintiffs incorporate by reference as though fully set forth herein all averments above.

395. Defendants' conduct as detailed above was intentional. Defendants' conduct was extreme, malicious, extraordinary, vicious, sadistic, outrageous, spiteful, grotesque, deceitful, and of such character as not to be tolerated by a civilized society.

396. Defendants' conduct caused Thomas severe emotional distress. As a direct and proximate result of Defendants' conduct, Thomas has suffered unthinkable mortification, humiliation, horror, embarrassment, internal discord, dehumanization, and loss of respect and personhood.

397. As a direct and proximate result of Defendants' intentional infliction of emotional distress on Thomas, he has suffered and continue to suffer injury and damage, including mental and physical pain and illness, mental and physical suffering, emotional distress, mortification, terror, horror, severe apprehension, anxiety, depression, distraction and mental and physical impairment and disability, the inability to concentrate and enjoy his chosen livelihood of composing and creating and performing music, fear and fright, agitation, degradation, and a profound diminishment in his enjoyment of life and the loss of the ability to enjoy his professional,

76

social, creative, and recreational life, and the enjoyment of all usual and ordinary aspects of life in the future.

398. Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual, consequential, and exemplary damages in the full to which Plaintiffs are entitled, and Plaintiffs further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

## Count Ten
### Invasion of Privacy (False Light)

399. Plaintiffs incorporate by reference as though fully set forth herein all averments above.

400. The facts published by Defendants, knowingly, intentionally, with malice, recklessly, in reckless disregard or indifference to whether they would cause harm, and carelessly, of or concerning Plaintiffs or falsely attributing to Plaintiffs statements or conduct, including but not limited to those detailed herein, caused damage to Plaintiffs.

401. Such statements and conduct of Defendants, including the numerous statements, innuendo, and acts of Defendants, acting alone or through others, directly or indirectly, detailed above and statements, including those detailed above, constitute an offensive invasion of privacy placing Plaintiffs in a false light by misstatement of facts.

402. Defendants' publications and republications and the publications and re-publications made by others, of misstatements of fact attributed, have attributed, and continue to attribute to Plaintiffs characteristics, conducts, and beliefs that were false and placed Plaintiffs in a false position.

77

403. Defendants repeatedly published and re-published in the same, similar, related, modified, or supplemental communications containing misstatements to a large group of third persons, who, in turn, repeated such misstatements to still more persons, constituting the multi-level generations and re-generations of publicity against Plaintiffs.

404. Defendants' wrongful statements and conduct of or concerning Plaintiffs, or falsely attributing to Plaintiffs improper statements or conduct, have portrayed and have resulted in the portrayal or placement of Plaintiffs in a false light in the public eye.

405. Such false light in which Defendants have placed Plaintiffs is highly offensive to a reasonable person.

406. Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiffs would be placed.

407. As a direct and proximate result of such false light invasion of privacy practiced by Defendants against Plaintiffs, Plaintiffs have suffered damages and injuries including monetary loss, embarrassment, humiliation and mental pain that a person of ordinary sensibilities would have suffered.

408. Thus, Plaintiffs are entitled to recover from Defendants actual damages and exemplary damages to recompense them for such injuries, as well as equitable relief appropriate in the premises, including but not limited to injunctive and declaratory relief.

409. Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual, consequential, and exemplary damages in the full to which Plaintiffs are entitled, and Plaintiffs further request the

78

entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

Count Eleven
Invasion of Privacy (Appropriation)

410.    Plaintiffs incorporate by reference as though fully set forth herein all averments above.

411.    Defendants used names and likenesses to their pecuniary and other advantage and benefit.

412.    The names and likenesses are those of Plaintiffs, including but not limited to the names, likenesses, and identifying elements, features, logos and indicia of Plaintiffs, subject to trademark and copyright protection and otherwise, as detailed above.

413.    The names and likenesses were used in reference to Plaintiffs.

414.    Defendants' uses of the names and likenesses were unauthorized.

415.    Defendants' wrongful statements and conduct of or concerning Plaintiffs, or falsely attributing improper statements or conduct, have portrayed and have resulted in the portrayal or placement of Plaintiffs in a false light in the public eye.

416.    Plaintiffs are entitled to recover from Defendants actual damages and exemplary damages to recompense them for such unauthorized uses and injuries suffered by Plaintiffs as a direct and proximate wrongful and unauthorized use, as well as equitable relief appropriate in the premises, including but not limited to injunctive and declaratory relief.

417.    Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual, consequential, and exemplary  damages in the full to which Plaintiffs are entitled, and Plaintiffs further request the

entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

Count Twelve
Invasion of Privacy (Intrusion into Private Affairs)

418. Plaintiffs incorporate by reference as though fully set forth herein all averments above.

419. Plaintiffs had matters of a private nature to them, including but not limited to the private, sensitive, valuable, confidential and proprietary digital data, computer information, and electronically-kept and stored information that was hacked via use of a computer over the Internet, as detailed above in connection with the events and facts detailed above.

420. Plaintiffs had and have the right to keep such matters private.

421. Upon information and belief, Defendants invaded Plaintiffs' privacy by obtaining information about the matter by a method that would be objectionable to a reasonable person. Alternatively, Defendants caused third parties to invade Plaintiffs' privacy in this manner, accessing Plaintiffs' electronic files.

422. As a direct and proximate result of such invasions, Plaintiffs have suffered injuries and damages.

423. Plaintiffs are entitled to recover from Defendants actual damages and exemplary damages to recompense them for such unauthorized invasions and injuries suffered by Plaintiffs as a direct and proximate wrongful and unauthorized invasions, as well as equitable relief appropriate in the premises, including but not limited to injunctive and declaratory relief.

424. Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

80

Therefore, Plaintiffs demand judgment against Defendants for actual, consequential, and exemplary damages in the full to which Plaintiffs are entitled, and Plaintiffs further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

Count Thirteen
Defamation

425. Plaintiffs incorporate by reference as though fully set forth herein all averments above.

426. The words and conduct of Defendants of and concerning Plaintiffs, as detailed above, constitute defamation.

427. Written statements and communications of Defendants of or concerning Plaintiffs as specifically detailed above, whether transmitted in electronic or other form, constitute defamation by libel and slander.

428. The libel is comprised of all statements detailed above, taken together, communicated electronically or otherwise, which statements were communicated to third persons and have a tendency to harm Plaintiffs' reputations, and all of which, in isolation, or taken together as a whole or in some part or parts less than the whole, were false in material respects.

429. Such statements, whether isolated or taken and aggregated together collectively in full context and as a part or the whole of a pattern, were false, defamatory, of or concerning Plaintiffs, of defamatory meaning as to Plaintiffs, and defamatory concerning Plaintiffs.

430. Such statements were published without privilege to third parties.

431. Such statements and conduct were made or done wickedly, with malice, maliciously, knowingly, purposefully, intentionally.

432. Alternatively, such were made and done with reckless disregard as to their falsity.

81

433. Alternatively, such statements and conduct were done by Defendants in a manner and with a state of mind so reckless as to demonstrate a substantial lack of concern for whether an injury results.

434. Alternatively, such statements and conduct were made and done negligently or carelessly as to their falsity, or were made recklessly, or with reckless disregard of, or indifference to, whether the statements and communications published to third parties were false, deceptive, or misleading.

435. Such false statements, communications, and conduct were defamatory as to Plaintiffs, and, under all of the circumstances, such communications were so or of such a nature or extent under the contexts and circumstances, that such communications tend so to harm the reputation of Plaintiffs that they lowered and have continued to lower the reputations of Plaintiffs in their own community, in communities in which they deal or have involvement or relation, and in other communities, and deter others from associating or dealing with Plaintiffs

436. Defendants did not act with reasonable prudence in publishing the statements.

437. Defendants made the false and defamatory statements knowing, intending, or with the expectation that they would be re-published by some of those to whom Defendants originally published them.

438. Defendants published the statements to third persons with knowledge of the falsity of the statements or in reckless disregard of their truth or falsity.

439. Defendants and others did, in fact, repeat and re-publish, in second waves, or third waves or more, the false and defamatory statements that Defendants initially and originally published to their respective and original, first-wave, audiences, and then re-published some or all of them, in part or in whole, in same, similar, modified, and in dissimilar form, supplemented,

82

enlarged, or abridged, in whole or in part, with the intent to disseminate each re-publication or modified re-publication to different audiences to amplify their audiences.

440.   Defendants' publications and republications and the publications and re-publications made by others, of misstatements of fact attributed, have attributed, and continue to attribute to Plaintiffs characteristics, conducts, and beliefs that were false.

441.   Defendants repeatedly published and re-published in the same, similar, related, modified, or supplemental communications containing misstatements to large groups of third parties, who, in turn, re-published and repeated such misstatements to still more persons, constituting the multi-level generations and re-generations of publicity against Plaintiffs, diminishing and destroying Plaintiffs' reputation, esteem, and standing, on a mass basis.

442.   As a direct and proximate result of such defamation, Plaintiffs were injured and remain injured in their reputations, esteem, and standing in the community such that others have been thereby deterred or precluded from associating or dealing with Plaintiffs. As a direct and proximate result of such defamation, Plaintiffs were injured and remain injured in their property, business, and feelings, other non-economic injury, and other economic injury, including but not limited to attorney fees, court costs, and other expenses of litigation and suffered, have suffered, and continue to suffer such injuries and special injuries, and actual, exemplary, and special damages, entitling them to recover actual, exemplary, punitive, and special damages, which injuries include but are not limited to emotional distress, humiliation, mortification and embarrassment, sleeplessness, anxiety, dehumanization, beleaguerment, and other damages that may arise during the course of discovery and the course of this action up to and including at trial, including but not limited to the damages and injuries detailed above.

443.   Plaintiffs are further entitled to recover from Defendants, in addition to actual damages including attorney fees, exemplary damages inasmuch as Defendants have failed to honor

83

Plaintiffs' due notice of retraction within a reasonable time, and inasmuch as Defendants' wickedness, malice, and malicious intent and conduct amplified and continues to amplify injury to Plaintiffs' feelings.

444.    Plaintiffs are entitled to recover exemplary damages in such amount so as to compensate Plaintiffs for incremental and increased injuries to Plaintiffs' feelings or increased injury to feelings attributable to their sense of indignation and outrage caused by Defendants' bad faith or ill will.

445.    Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual, consequential, exemplary and punitive damages in the full amount to which Plaintiffs are entitled, and Plaintiffs further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

Count Fourteen
Defamation by Implication and Association
and Defamation *Per Se*

446.    Plaintiffs incorporate by reference as though fully set forth herein all averments above.

447.    The words and conduct of Defendants of and concerning Plaintiffs, as detailed above, constitute defamation by libel and slander, defamation by implication and association, and defamation *per se*.

448.    Defendants' wrongful statements and conduct of or concerning Plaintiffs or falsely attributed to Plaintiffs, are defamatory and constitute defamation by libel and slander. Such statements were false and defamatory concerning Plaintiffs, made by unprivileged publication or

84

publications to one or more third parties, maliciously, wickedly, recklessly, with reckless indifference to or disregard for the truth of the statements and communications by word or conduct, carelessly, or negligently by Defendants, actionable irrespective of special harm, and actionable given that Plaintiffs have suffered both actual and special damages and special harm as a direct and proximate result of the defamation of Defendants.

449. Such statements were published without privilege to third parties.

450. Such statements and conduct were made or done wickedly, with malice, maliciously, knowingly, purposefully, intentionally.

451. Alternatively, such were made and done with reckless disregard as to their falsity.

452. Alternatively, such statements and conduct were done by Defendants in a manner with a state of mind so reckless as to demonstrate a substantial lack of concern for whether and injury results.

453. Alternatively, such statements and conduct were made and done negligently or carelessly as to their falsity, or were made recklessly, or with reckless disregard of, or indifference to, whether the statements and communications published to third parties were false, deceptive, or misleading.

454. Such wrongful statements and conduct were of or concerning Plaintiffs and falsely attributed false statements to Plaintiffs or other falsely attributed other unlawful, improper, corrupt, or dishonest conduct or motive to Plaintiffs. At a minimum, taken as a whole and in light of all pertinent surrounding circumstances, Defendants' statements and conduct, at the very least, implied and imply the defamatory meaning that Plaintiffs are dishonest, unscrupulous, corrupt, despicable, and otherwise of untrustworthy and bad character. Such defamatory implications were and are materially false.

455. Defendants, by their words and conduct, commissions of wrongful acts and wrongful omissions and failures to act under the circumstances, juxtaposed a series of fact so as to imply a defamatory connection between them, or create a defamatory implication by omitting facts such that they are to be held responsible for the defamatory implication harmful to Plaintiffs' reputations, as detailed hereinabove.

456. Defendants' defamation and defamation by implication against Plaintiffs as detailed above further constitute defamation per se inasmuch as such defamation is by the assertion, by words or conduct, stating or implying that Plaintiffs corruptly schemed to carry out a plan, and in fact carried out, or attempted to carry out, a plan, by corrupt means or devise, either directly or indirectly, to influence others in political and ideological matters. The words and conduct of Defendants imputed, have imputed, and continue to impute to Defendants the commission of a criminal offense or several criminal offenses, and, thus, are actionable in themselves and subject Defendants who uttered and published them to a civil action for the defamation and defamation by implication.

457. Such defamation and defamation by implication are based on false accusations against Plaintiffs of criminal activity, and, thus, constitute defamation *per se*.

458. Further, such defamation and defamation by implication are by words and conduct, of statements, communications, or implication published to third persons, taken together as a whole, in full context, all of which are materially false, and constitute the accusation against Plaintiffs of contemptible and despicable words and conduct, and holding Plaintiffs up to hatred, scorn, contempt, and ridicule, and, as such, constitutes defamation *per se*.

459. Further, as such defamation or defamation by implication was carried out by Defendants against Plaintiffs with malicious intent, or with reckless disregard for the whether such defamatory meaning were true, constitutes defamation *per se* against Plaintiffs.

86

460.    Despite proper notice, Defendants have failed and refused to retract such defamatory communications.

461.    Defendants published the statements to third persons with knowledge of the falsity of the statements or in reckless disregard of their truth or falsity.

462.    Defendants and others did, in fact, repeat and re-publish, in second waves, or third waves or more, the false and defamatory statements that Defendants initially and originally published to their respective and original, first-wave, audiences, and then re-published some or all of them, in part or in whole, in same, similar, modified, and in dissimilar form, supplemented, enlarged, or abridged, in whole or in part, with the intent to disseminate each re-publication or modified re-publication to different audiences to amplify their audiences.

463.    Defendants' publications and republications and the publications and re-publications made by others, of misstatements of fact attributed, have attributed, and continue to attribute to Plaintiffs characteristics, conducts, and beliefs that were false.

464.    Defendants repeatedly published and re-published in the same, similar, related, modified, or supplemental communications containing misstatements to large groups of third parties, who, in turn, re-published and repeated such misstatements to still more persons, constituting the multi-level generations and re-generations of publicity against Plaintiffs, diminishing and destroying Plaintiffs' reputation, esteem, and standing, on a mass basis.

465.    As a direct and proximate result of such wrongful conduct, Plaintiffs have suffered the injuries detailed above, both economic and non-economic, including but not limited to actual damages, special damages, exemplary damages, and punitive damages, as well as costs and attorney fees so wrongfully sustained. Plaintiffs are especially entitled to exemplary damages because, despite due notice and the passage of a reasonable amount of time, Defendants have not

87

published a retraction of the defamatory statements and implications and have acted with malice or with malice have failed to act.

466. Defendants made the false and defamatory statements knowing, intending, or with the expectation that they would be re-published by some of those to whom Defendants originally published them.

467. Defendants published the statements to third persons with knowledge of the falsity of the statements or in reckless disregard of their truth or falsity.

468. Defendants and others did, in fact, repeat and re-publish, in second waves, or third waves or more, the false and defamatory statements that Defendants initially and originally published to their respective and original, first-wave, audiences, and then re-published some or all of them, in part or in whole, in same, similar, modified, and in dissimilar form, supplemented, enlarged, or abridged, in whole or in part, with the intent to disseminate each re-publication or modified re-publication to different audiences to amplify their audiences.

469. Defendants' publications and republications and the publications and re-publications made by others, of misstatements of fact attributed, have attributed, and continue to attribute to Plaintiffs characteristics, conducts, and beliefs that were false.

470. Defendants repeatedly published and re-published in the same, similar, related, modified, or supplemental communications containing misstatements to large groups of third parties, who, in turn, re-published and repeated such misstatements to still more persons, constituting the multi-level generations and re-generations of publicity against Plaintiffs, diminishing and destroying Plaintiffs' reputation, esteem, and standing, on a mass basis.

471. As a direct and proximate result of such defamation, Plaintiffs were injured and remain injured in their reputations, esteem, and standing in the community such that others have been thereby deterred or precluded from associating or dealing with Plaintiffs. As a direct and

proximate result of such defamation, Plaintiffs were injured and remain injured in their property, business, and feelings, other non-economic injury, and other economic injury, including but not limited to attorney fees, court costs, and other expenses of litigation and suffered, have suffered, and continue to suffer such injuries and special injuries, and actual, exemplary, and special damages, entitling them to recover actual, exemplary, punitive, and special damages, which injuries include but are not limited to emotional distress, humiliation, mortification and embarrassment, sleeplessness, anxiety, dehumanization, beleaguerment, and other damages that may arise during the course of discovery and the course of this action up to and including at trial, including but not limited to the damages and injuries detailed above.

472. Plaintiffs are further entitled to recover from Defendants, in addition to actual damages including attorney fees, exemplary damages inasmuch as Defendants have failed to honor Plaintiffs' due notice of retraction within a reasonable time, and inasmuch as Defendants' wickedness, malice, and malicious intent and conduct amplified and continues to amplify injury to Plaintiffs' feelings.

473. Plaintiffs are entitled to recover exemplary damages in such amount so as to compensate Plaintiffs for incremental and increased injuries to Plaintiffs' feelings or increased injury to feelings attributable to their sense of indignation and outrage caused by Defendants' bad faith or ill will.

474. Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual, consequential, exemplary and punitive damages in the full amount to which Plaintiffs are entitled, and Plaintiffs

further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

### Count Fifteen
### Business Defamation by Implication and Association
### and Business Defamation *Per Se*

475. Plaintiffs incorporate by reference as though fully set forth herein all averments above.

476. The words and conduct of Defendants of and concerning Plaintiffs, as detailed above, constitute defamation by slander and by libel *per se*.

477. As detailed above, Defendants made numerous false statements, detailed above, that might injure the Company in its business and Thomas in his business concerning the Company.

478. Those false statements included false statements that might injure Plaintiffs' business interests and deter third persons from dealing with the businesses. Thus, Defendants words of or concerning Plaintiffs constitute business defamation *per se*.

479. Because the false statement of Defendants were and are defamatory *per se*, they are actionable without proof of special, or actual, damages.

480. In any case, Plaintiffs did suffer special damages as detailed above, and they are further entitled to recoverable special damages.

481. Such statements were published without privilege to third parties.

482. Such statements and conduct were made or done wickedly, with malice, maliciously, knowingly, purposefully, intentionally.

483. Alternatively, such were made and done with reckless disregard as to their falsity.

484. Alternatively, such statements and conduct were done by Defendants in a manner and with a state of mind so reckless as to demonstrate a substantial lack of concern for whether and injury results.

90

485.   Alternatively, such statements and conduct were made and done negligently or carelessly as to their falsity, or were made recklessly, or with reckless disregard of, or indifference to, whether the statements and communications published to third parties were false, deceptive, or misleading.

486.   Such wrongful statements and conduct were of or concerning Plaintiffs and falsely attributed false statements to Plaintiffs or other falsely attributed other unlawful, improper, corrupt, or dishonest conduct or motive to Plaintiffs. At a minimum, taken as a whole and in light of all pertinent surrounding circumstances, Defendants' statements and conduct, at the very least, implied and imply the defamatory meaning that Plaintiffs are dishonest, unscrupulous, corrupt, despicable, and otherwise of untrustworthy and bad character. Such defamatory implications were and are materially false.

487.   Despite proper notice, Defendants have failed and refused to retract such defamatory communications.

488.   Defendants published the statements to third persons with knowledge of the falsity of the statements or in reckless disregard of their truth or falsity.

489.   Defendants and others did, in fact, repeat and re-publish, in second waves, or third waves or more, the false and defamatory statements that Defendants initially and originally published to their respective and original, first-wave, audiences, and then re-published some or all of them, in part or in whole, in same, similar, modified, and in dissimilar form, supplemented, enlarged, or abridged, in whole or in part, with the intent to disseminate each re-publication or modified re-publication to different audiences to amplify their audiences.

490.   Defendants' publications and republications and the publications and re-publications made by others, of misstatements of fact attributed, have attributed, and continue to attribute to Plaintiffs characteristics, conducts, and beliefs that were false.

491. Defendants repeatedly published and re-published in the same, similar, related, modified, or supplemental communications containing misstatements to large groups of third parties, who, in turn, re-published and repeated such misstatements to still more persons, constituting the multi-level generations and re-generations of publicity against Plaintiffs, diminishing and destroying Plaintiffs' reputation, esteem, and standing, on a mass basis.

492. As a direct and proximate result of such wrongful conduct, Plaintiffs have suffered the injuries detailed above, both economic and non-economic, including but not limited to actual damages, special damages, exemplary damages, and punitive damages, as well as costs and attorney fees so wrongfully sustained. Plaintiffs are especially entitled to exemplary damages because, despite due notice and the passage of a reasonable amount of time, Defendants have not published a retraction of the defamatory statements and implications and have acted with malice or with malice have failed to act.

493. As a direct and proximate result of such defamation, Plaintiffs were injured and remain injured in their reputations, esteem, and standing in the community such that others have been thereby deterred or precluded from associating or dealing with Plaintiffs. As a direct and proximate result of such defamation, Plaintiffs were injured and remain injured in their property, business, and feelings, other non-economic injury, and other economic injury, including but not limited to attorney fees, court costs, and other expenses of litigation and suffered, have suffered, and continue to suffer such injuries and special injuries, and actual, exemplary, and special damages, entitling them to recover actual, exemplary, punitive, and special damages, which injuries include but are not limited to emotional distress, humiliation, mortification and embarrassment, sleeplessness, anxiety, dehumanization, beleaguerment, and other damages that may arise during the course of discovery and the course of this action up to and including at trial, including but not limited to the damages and injuries detailed above.

92

494.    Plaintiffs are further entitled to recover from Defendants, in addition to actual damages including attorney fees, exemplary damages inasmuch as Defendants have failed to honor Plaintiffs' due notice of retraction within a reasonable time, and inasmuch as Defendants' wickedness, malice, and malicious intent and conduct amplified and continues to amplify injury to Plaintiffs' feelings.

495.    Plaintiffs are entitled to recover exemplary damages in such amount so as to compensate Plaintiffs for incremental and increased injuries to Plaintiffs' feelings or increased injury to feelings attributable to their sense of indignation and outrage caused by Defendants' bad faith or ill will.

496.    Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual, consequential, exemplary and punitive damages in the full amount to which Plaintiffs are entitled, and Plaintiffs further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

Count Sixteen
Negligent Infliction of Emotional Distress

497.    Plaintiffs incorporate by reference as though fully set forth herein all averments above.

498.    The acts and omissions of Defendants detailed above would naturally and probably result in emotional distress.

499.    Such conduct of Defendants as detailed above was done by Defendants in a manner and with a state of mind so reckless as to demonstrate a substantial lack of concern for whether and injury results.

93

Michigan as the conduct, acts, and omissions of Dilley were done in the course and scope of performance and employment with the and by the University.

514. The Trustees and other defendants are further directly liable to Plaintiffs for their failure to exercise due care in the hiring, supervision, training, and retention of Dilley and other defendants in matters respecting Plaintiffs.

515. The Trustees and other defendants owed Plaintiffs duties to exercise due care in the hiring, supervision, training, and retention of Dilley and other defendants in matters respecting Plaintiffs.

516. The Trustees and other defendants are legally responsible for bringing Dilley, their employee, and other defendants, their agents, into contact with Plaintiffs and other members of the public despite knowledge that doing so was likely to end poorly.

517. In hiring Dilley as an employee of the University, and other defendants as agents and representatives of the University with actual or ostensible authority holding themselves out as agents and representatives of the University, the Trustees had actual or constructive knowledge enabling them to appreciate that such specific conduct Dilley turned out to perpetrate on Plaintiffs, as detailed above, was predictable.

518. The Trustees and other defendants caused or permitted Dilley and other defendants to become a member of the faculty of the University and retained her as an employee even though they knew or should have known she was acting with and under a serious medical disability affecting her judgment, reasoning, perception and otherwise impeded and prevented her from well, faithfully, and honestly performing her duties and responsibilities of employment with the University, as detailed above.

519. The Trustees and other defendants knew or should have known that Dilley's medical condition, state, malady, illness, and disability, on top of her nature and propensity for

96

dishonesty and querulousness compromised her ability properly to perform her employment responsibilities, including her responsibilities affecting and concerning Plaintiffs and that such disabilities would lead to the injurious result caused to, and suffered by, Plaintiffs as detailed herein.

520.    The Trustees and other defendants knew or should have known that Dilley lacked competency to perform research, writing, publishing, and other work concerning the matters in which she endeavored that affected or concerned Plaintiffs, including but not limited to her involvement in studying, research, and commenting publicly or privately on QAnon propaganda on Twitter/X, as detailed above, and that including her responsibilities affecting and concerning Plaintiffs and that such disabilities and limitations of Dilley would lead to the injurious result caused to, and suffered by, Plaintiffs as detailed herein.

521.    Dilley and other defendants were and are under a legal duty requiring them to conform to particular standards of conduct with no ability to satisfy that duty, and the Trustees, in turn, had their own legal duties owing to Plaintiffs requiring them to conform to particular standards of conduct in hiring, supervising, retaining, and training Dilley and other defendants to protect Plaintiffs and others against unreasonable risks of harm.

522.    Yet, the Trustees and other defendants knowingly caused or permitted Dilley and other defendants to undertake responsibilities that even Dilley, herself knew, and openly and candidly confessed, she did not have the ability to satisfy. The Trustees, thus, breached their duties of care owing to Plaintiffs, and, as a direct and proximate result of those breaches of duty, Plaintiffs have suffered injury and damages, both economic and non-economic.

523.    Such conduct of Defendants respecting Plaintiffs as detailed above was done by Defendants in a manner and with a state of mind so reckless as to demonstrate a substantial lack of concern for whether and injury results in this regard.

97

524. Alternatively, conduct was done by Defendants negligently or carelessly in disregard of, or with callous indifference to Plaintiffs and the rights of Plaintiffs and as to whether Plaintiffs would suffer injury as a consequence of such conduct in this regard.

525. Dilley and other defendants were grossly negligent in connection with the performance by Dilley of her job duties and the acts and omissions of other defendants within the scope of their authority and agency relationship with the Trustees and other defendants concerning Plaintiffs, and the Trustees and other defendants were grossly negligent in performing their duties to hire, retain, train, and supervise Dilley so as to protect Plaintiffs and others against unreasonable risks of harm. As a direct and proximate result of that gross negligence, Plaintiffs were, in fact, subjected to unreasonable risks of harm and suffered injury and damages as a direct and proximate result of being subjected to such unreasonable risks of harm.

526. Defendants have committed, are committing, and threaten to commit, such acts and omissions either in their respective official capacities or, alternatively, outside of their official capacities and in their respective individual capacities.

Therefore, Plaintiffs demand judgment against Defendants for actual, consequential, and exemplary damages in the full amount to which Plaintiffs are entitled, and Plaintiffs further request the entry of a decree for all equitable relief to which they are entitled, along with an award of costs and attorney fees so wrongfully sustained.

Respectfully submitted,

CRANBROOK LAW GROUP, P.C.

By__ /s/ *Barry R. Powers*
    Barry R. Powers (P40589)
Plaintiffs' counsel

DATED: August 7, 2025

98

Verification

I, Thomas Schoenberger, Plaintiff in the above-entitled action, this 7th day of August, 2025, declare, under penalties of perjury, that I have examined the above Complaint and that its contents are true to the best of my knowledge, information, and belief.

/s/ *Thomas Andrew Schoenberger*
Thomas Andrew Schoenberger

99